BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS TANASSE, Derivatively on Behalf of Nominal Defendant ORIGIN MATERIALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN BISSELL, RICHARD J. RILEY, PIA HEIDENMARK COOK, KATHLEEN B. FISH, WILLIAM HARVEY, KAREN RICHARDSON, CHARLES DRUCKER, CRAIG ROGERSON, JIM STEPHANOU, and R. TONY TRIPENY, <br><br> Defendants, <br><br> and <br><br> ORIGIN MATERIALS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Travis Tanasse ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Origin Materials, Inc. ("Origin" or the "Company"), files this Shareholder Derivative Complaint against John Bissell ("Bissell"), Richard J. Riley ("Riley"), Pia Heidenmark Cook ("Cook"), Kathleen B. Fish ("Fish"),  William Harvey ("Harvey"), Karen Richardson ("Richardson"), Charles Drucker ("Drucker"), Craig Rogerson ("Rogerson"), Jim Stephanou ("Stephanou"), and R. Tony Tripeny ("Tripeny")  (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Origin.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Origin, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Eastern District of California captioned *In re Origin Materials, Inc. Securities Litigation*, (*Soto v. Origin Materials, Inc., et al.*), No. 2:23-cv-01816-WBS-JDP (E.D. Cal.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1. This is a shareholder derivative action brought in the right, and for the benefit, of Origin against certain of its officers and directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from February 23, 2023 to August 9, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Origin and its shareholders, including monetary losses and damages to Origin's reputation and goodwill.

2. Founded in 2008, Origin is a company focused on sustainable materials. The Company

claims to have created a platform that transforms carbon from biomass into carbon-negative materials, which can substitute for petroleum-based substances commonly used in various products. One of the sustainable materials in Origin's platform is chloromethylfurfural (CMF), a building block chemical that can be converted into products such as paraxylene (PX) and furandicarboxylic acid (FDCA). PX can replace non-sustainable chemicals in supply chains to produce polyethylene terephthalate (PET), while FDCA can be converted into polyethylene furanoate (PEF). Both chemicals have purported diverse applications: PET is used in packaging, textiles, car parts, carpeting, toys, and construction materials. FDCA and PEF are used in surfactants, epoxy resins, and packaging – PEF even having the potential to compete with glass and aluminum in its application and use. In connection with a 2021 merger, Origin announced it would be undertaking two capital projects – the construction of Origin 1 and Origin 2 plants for the development of the Company's products. Origin 2, whose purpose was reported to meet strong existing customer demand for PX and PET, was supposed to be complete and operational in 2025.

3.     This complaint arises from Origin's misrepresentations to investors about: (i) the timeline for the construction and launching of operations for its Origin 2 plant; (ii) the demand, and the Company's ability to meet the same, for PET derived from PX, and the resulting effects on Company value and profits; (iii) the cost of construction for Origin 2; (iv) the feasibility and scale of Origin 2; and (v) the resulting artificially inflated market and securities values of the Company.

4.     More than two years prior to the start of the Relevant Period, Origin announced a merger with a special purpose acquisition company with the intent to go public. As part of this announcement, Origin also represented its intent to build its largest (and first commercial-scale) plant, primarily for the production of PX and PET. Planning to begin construction mid-2023, and have the plant operational by mid-2025, the Company represented that Origin 2 would be producing the majority of Origin's products between 2025 and 2027. With an initial reported cost of plant at $1.07 billion, the Company represented that it would not obtain positive earnings before interest, taxes, depreciation, and amortization ("EBITDA") or reach commercial scale production before 2025, when Origin 2 was expected to be operational.

5.      Based on this timeline, the Company repeatedly reassured the public, analysts, and investors that the planning and construction of Origin 2 was on schedule to meet the 2025 goal through marketing and SEC filings.

6.      During this same period, the Company repeatedly touted PET's potential product scope, large market demand, and low margin to investors, while continuing to represent that the product, along with PX, would be produced at Origin 2. Moreover, by February 23, 2023, the Company reported that it had secured contracts for all of Origin 2's PX/PET capacity and that it therefore might incorporate other products into Origin 2's production abilities.

7.      In fact, by February 23, 2023, the Company was actually aware that it would be unable to produce PX/PET at its new plant's intended scale and design. Problems with development of PX at commercial scale were in fact delaying Origin 2's engineering design and front-end loading development. Not only that, but because of the actual costs of developing and producing PX, the Company was moving away from its commitment to the product. To compound the problem, as the Company tried to work through the issues with PX development and production, the engineering and design plans for Origin 2 were further delayed, as the cost of the plant to the company grew.

8.      In May of 2023, Origin finally came to terms with the fact that Origin 2 was simply not going to go online on the predicted, and much touted schedule of by 2025. In response, the Company was forced to amend its offtake contract with one of its most valuable customers and investors, Pepsi, to take the delay in construction and new focus on FDCA (and away from PX) into account.

9.      Finally, on August 9, 2023, the truth was finally revealed to the public. The Company finally disclosed that everything it had been projecting and marketing about Origin 2 had shifted, from its construction timeline and on-line target date (completion was pushed to 2028), to the type and amount of product it had originally been designed to produce (from PX to FDCA), to the amount of money that the project was going to cost the Company.

10.     The news came as a shock to investors, who had been repeatedly misled about the status and prospects of Origin 2. As a result, Origin's stock price fell by approximately 66.5% on August 10, 2023, and then another 68% from there by November 1, 2023. By January 4, 2024, Origin was forced

to disclose to its investors that it had failed to meet its NASDAQ listing obligations, closing at below $1.00 per share for over 30 consecutive business days.

11.     Throughout the Relevant Period, Defendants failed to disclose the ongoing changes to the Company's plans for Origin 2, including its timeline, intended purpose, and overall cost to the Company. Instead, they repeatedly represented that Origin 2 was on track to meet its original construction timeline, with its original purported focus of producing PX, what the Company sold to investors as its "flagship" product.

12.     Throughout the Relevant Period, the Individual Defendants made or caused Origin to make false and misleading statements and/or failed to disclose that, among other things: (1) problems it was experiencing developing its much touted product, PX; (2) the effects of such complications on the design, engineering, and construction of its also much touted flagship commercial scale production plant, Origin 2; (3) the timeline, actual purpose, and realistic costs of getting Origin 2 up and running; (4) the resulting overall value (and/or cost) of the project to the Company.

13.     As a result of the foregoing, Origin, as well as the Company's then Co-Chief Executive Officers ("CEO") were named as defendants in a Securities Action by investors who allege they were damaged when they purchased Origin shares during the Relevant Period.

14.     On February 12, 2025, the court in the Securities Class Action denied the defendants' motion to dismiss in part under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). These actionable statements will expose the Company to significant class-wide liability moving forward.

15.     Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of Origin's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.142-9) promulgated thereunder by the SEC.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

**PARTIES**

**Plaintiff**

22.     Plaintiff is, and has been at all relevant times, a shareholder of Origin.

**Nominal Defendant**

23.     Nominal Defendant Origin is incorporated under the laws of Delaware, with its principal executive offices located at 930 Riverside Pkwy #10, West Sacramento, California 95605. Origin common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "ORGN."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Individual Defendants**

24.    Defendant John Bissell ("Bissell") co-founded Origin in 2008 and has served as its CEO or co-CEO, as well as sat on its Board of Directors since then. Additionally, he is named as a defendant in the Securities Class Action.

25.    The Company's 2024 Proxy Statement stated the following about Defendant Bissell:

> John Bissell co-founded Origin Materials in November 2008 and served as its Chief Executive Officer—now co-Chief Executive Officer—and a member of its board of directors since inception. Mr. Bissell was trained as a chemical engineer at UC Davis, and has extensive experience in R&D, engineering, and business development in the chemical industry. He's been recognized by the US EPA, Forbes, and the University of California for his professional and technical contributions. Finally, he's raised over half a billion USD in capital, and took Origin Materials public in 2021. We believe that Mr. Bissell's extensive experience in the materials industry, his experience as an executive, and his leadership of Origin qualify him to serve as our director.

26.    Defendant Richard J. Riley ("Riley"), an advisor to and investor in the Company since 2010, served as Origin's co-CEO from 2020 to December of 2024. Additionally, Riley is named as a defendant in the Securities Class Action.

27.    The Company's 2024 Proxy Statement stated the following about Defendant Riley:

> Rich Riley has served as Co-Chief Executive Officer and a member of the board of directors of Origin Materials since October 2020. Mr. Riley has been an advisor to and investor in Origin since 2010. From April 2013 to January 2019, Mr. Riley was the Chief Executive Officer of Shazam Entertainment Ltd, a leading mobile music application that was acquired by Apple Inc. in 2018. Mr. Riley has served as an industry advisor to KKR & Co. L.P., a leading global investment firm from 2013 to 2022, since 2013. Mr. Riley was an executive at Yahoo! Inc. from Jan 1999 to Sept. 2012 with roles including EVP, Americas and SVP & MD, EMEA Region. He joined Yahoo! when it acquired Log-Me-On.com, where he was the Co-Founder and Managing Member. Mr. Riley began his career as an investment banking analyst at Donaldson, Lufkin & Jenrette. Mr. Riley was a finalist for Ernst & Young's Entrepreneur of the Year Award, Featured in Forbes 40 under 40 Ones to Watch and included three times in Billboard Magazine's Power 100 list. Mr. Riley is a Trustee at St. Luke's school, a former member of the advisory Board for the Entrepreneurship Department at the Wharton School and a member of the Executive Board of Boy Scouts of America, Connecticut Yankee Council. Mr. Riley received a B.S. in economics with concentrations in finance and entrepreneurial management from the Wharton School of the University of Pennsylvania. We believe that Mr. Riley's broad experience as an executive and advisor across industries qualifies him to serve as our director.

28.     Defendant Pia Heidenmark Cook ("Cook") has served as a member of the Board since June of 2021.

29.     The Company's 2024 Proxy Statement stated the following about Defendant Cook:

Pia Heidenmark Cook has served on Origin's board of directors since June 2021. Ms. Cook has also served as Chief Sustainability Officer at Ingka Group ("IKEA"), a holding company. Prior to this position, she served as head of Sustainability in IKEA Retail & Expansion for the IKEA Group from 2011 to 2017 and as head of Communications for the IKEA Foundation from 2008 to 2011. Prior to joining IKEA in 2008, Ms. Cook served as Vice President of Corporate Social Responsibility at the Rezidor Hotel Group from 2001 to 2008. Ms. Cook currently serves on the boards of Bupa, a health insurance company, MAX Burgers AB, a fast food company, and Decathlon SA, a sporting goods retailer. Ms. Cook also serves as senior advisor to Teneo, Eurazeo's Planetary Boundaries climate impact fund, and the DO Group. Ms. Cook has previously served as co-chair of The Retailers' Environmental Action Programme and as chairman of the tourism branch of the Prince of Wales Business Leaders Forum. Ms. Cook has received a Technical Licentiate degree and a M.Sc. in Environmental Management from the University of Lund, Sweden, and a M.Sc. in International Business Administration and Economics from Uppsala University, Sweden. We believe that Ms. Cook's extensive experience in sustainability and corporate social responsibility qualifies her to serve as our director.

30.     Defendant Kathleen B. Fish ("Fish") has served as a member of the Board since June 2021.

31.     The Company's 2024 Proxy Statement stated the following about Defendant Fish:

Kathleen B. Fish has served on Origin's board of directors since June 2021 and as Chair of the Compensation Committee since February 2023. Ms. Fish served as Chief Research, Development and Innovation Officer of Procter & Gamble, a consumer goods company, from February 2014 until December 2020. Prior to this, Ms. Fish served as vice president of the Global Fabric Care R&D organization at Procter & Gamble from January 2009 to January 2014, and as vice president of the Global Baby Care R&D organization at Procter & Gamble from November 2003 to November 2008. Ms. Fish joined Procter & Gamble in 1979 as part of its Product Development (R&D) organization. Ms. Fish is currently a member of the board of directors of USA Swimming and has served on the board of directors of Balchem, an industrial gas company, since June 2021. Ms. Fish received a B.S. in Chemical Engineering from Michigan State University. We believe that Ms. Fish's leadership experience in the consumer goods industry qualifies her to be on our board of directors.

32.     Defendant William Harvey ("Harvey") has served as a member of the Board of Origin Operating from June 2017 to June 2021, and as a member of the Origin's Board since June 2021.

33.     The Company's 2024 Proxy Statement stated the following about Defendant Harvey:

William J. Harvey served as a member of Origin Operating's board of directors from June 2017 to June 2021 and as a member of Origin's board and the Chair of the Nominating and Governance Committee since June 2021. Mr. Harvey served from July 2009 to December 2016 as the President of DuPont Packaging & Industrial Polymers (P&IP), a global business unit of E. I. du Pont de Nemours & Company, Inc., a chemical company. Mr. Harvey became a member of the board of directors of Bridgestone Americas, Inc., the North American subsidiary of a Japanese multinational auto and truck parts manufacturer, in June 2017. Since March 2011, Mr. Harvey has served on the board of directors of Kennametal, Inc., a supplier of tooling and industrial materials. In March 2020, Mr. Harvey joined the Management Board of Huber Engineered Woods LLC, a manufacturer and supplier of wood products and a wholly-owned subsidiary of J.M. Huber Corporation. Since March 2021, he has been a member of the board of Clean Chemistry, Inc, a company owned by Black Bay Energy Capital. As a part of that assignment, Mr. Harvey sits on Black Bay's Advisory Board which reviews strategic investment opportunities. Mr. Harvey received an MBA from the Darden School at the University of Virginia and a B.S. in Economics from Virginia Commonwealth University. We believe that Mr. Harvey's broad experience as an executive and board member in the packaging and materials industries qualify him to serve as our director.

34.     Defendant Karen Richardson ("Richardson") served as chair of the Board from June 2021 until March 1, 2024.

35.     The Company's 2023 Proxy Statement stated the following about Defendant Richardson:

Karen Ann Richardson has served as the Chair of Origin's board of directors since June 2021. Ms. Richardson has a breadth of experience in the technology services industry and has served as a non-executive director of BP plc, an energy company, since January 2021 and Exponent, an engineering and scientific consulting company, since February 2023. Ms. Richardson also served on the board of directors of Exponent from December 2013 to June 2022 and on the board of directors of Doma Holdings Inc., an insurance company, from August 2019 to January 2023. In addition, Ms. Richardson served as a director of Worldpay, a payment processing company, from 2018 until July 2019. Prior to this, Ms. Richardson was an independent non-executive director of Worldpay Group plc, a payment processing company. Ms. Richardson also served as a non-executive director at BT Plc, a telecommunications company, from October 2011 to August 2018. Prior to her time at Worldpay and BT, Ms. Richardson held a number

of senior sales and marketing roles in technology companies, including her tenure as Chief Executive Officer at Epiphany Inc. between 2003 and 2006. Ms. Richardson has also served as an advisor to Silver Lake Partners and has served on a number of private company boards, including i2 Holdings, Ayasdi LLC, Hackerrank, Convercent, Inc., Virtuoz, and Hi5 Networks, Inc. We believe that Ms. Richardson is qualified to serve on our board of directors given her leadership experience in technologically complex organizations.

36.    Defendant Charles Drucker ("Drucker") served as a member of the Board from June 2021 to February 1, 2024.

37.    The Company's 2023 Proxy Statement stated the following about Defendant Drucker:

Charles Drucker has served on Origin's board of directors since June 2021 and as Chair of the Compensation Committee from June 2021 to February 2023. Mr. Drucker has had a decades-long career in the financial services industry. Mr. Drucker was a member of the board of directors of Fidelity National Information Services, Inc. ("FIS"), a financial services company, and served as Vice Chairman until March 1, 2020. From January 2019 until its acquisition by FIS, he served as Executive Chairman and Chief Executive Officer of Worldpay, a leading global payments company, and also served as Worldpay's Executive Chairman and Co-Chief Executive Officer from January 2018 to December 2018. From 2009 to 2017, Mr. Drucker was the Chief Executive Officer of Worldpay's predecessor, Vantiv, Inc. Prior to joining Vantiv, Mr. Drucker served as Executive Vice President of Fifth Third Bancorp from June 2005 to June 2009. Prior to joining Fifth Third Bancorp, Mr. Drucker was with First Data Corporation and Wells Fargo. Mr. Drucker has also served on the board of directors of Donnelley Financial Solutions, Inc., a financial compliance company, since 2016. We believe that Mr. Drucker is qualified to serve on our board of directors because of his extensive senior management experience in the payments and technology industries, as well as his experience with deep financial services.

38.    Defendant Craig Rogerson ("Rogerson") has served as a member of the Board since May 2023.

39.    The Company's 2024 Proxy Statement stated the following about Defendant Rogerson:

Craig A. Rogerson served as a member of Origin's board of directors beginning on May 1, 2023 and will continue until the 2025 annual meeting of shareholders. Mr. Rogerson has four decades of executive experience leading private and publicly held specialty chemical companies. He served as Chairman, President and Chief Executive Officer of Hexion Inc., a leading global producer of adhesives and performance materials, from July 2017 until his retirement in January 2023. Hexion filed for Chapter 11 bankruptcy in April 2019 and reemerged from bankruptcy in July 2019. Previously, he served from December 2008 to April 2017 as Chairman, President and Chief

Executive Office at Chemtura Corporation, a global developer, manufacturer and marketer of engineered industrial specialty chemicals. Mr. Rogerson also served as President, Chief Executive Officer and Director of Hercules Incorporated, a global manufacturer of specialty chemicals, from December 2003 until November 2008. He has served as independent board chair of PPL Corporation, an electric utility company, since March 2021 and has served on the board of PPL Corporation since September 2005. He also currently serves on the boards of the Pancreatic Cancer Action Network and McLaren Northern Michigan Hospital. He also previously served on the boards of Ashland Global Holdings Inc., a chemicals manufacturer, from February 2019 to February 2021, the Society of Chemical Industry and the American Chemistry Council. Mr. Rogerson holds a chemical engineering degree from Michigan State University, and continues to serve on the Michigan State University College of Engineering Alumni board and on the advisory board of the Michigan State University Chemical Engineering & Materials Science Department. We believe that Mr. Rogerson is qualified to serve on our board of directors given his extensive leadership experience with manufacturing companies.

40.     Defendant Jim Stephanou ("Stephanou") has served as a member of the Board since June 2023.

41.     The Company's 2024 Proxy Statement stated the following about Defendant Stephanou:

Jim Stephanou has served on Origin's board of directors since June 2023. Mr. Stephanou is Chief Executive Officer for IPS (Integrated Project Services) and brings over thirty years of experience in manufacturing operations and engineering, including his current role as CEO of IPS, an engineering and construction services provider to the life sciences sector. Previously, he served as Vice President and Global Head of Engineering at Merck & Co., Inc. ("Merck"), a position he held from 2015 to 2023. Prior to joining Merck, he held various leadership positions at Bayer Technology Services Americas for over a decade, including roles as Vice President of Asset Management, Vice President and Plant Manager for Manufacturing and Technology, and Regional Director of Engineering and Maintenance. Mr. Stephanou joined Lyondell Basell Industries N.V. in 1988 and held a variety of supervisory positions with the company before being named Manager of Maintenance and Reliability in 2000. Mr. Stephanou holds a mechanical engineering degree from Drexel University. We believe that Mr. Stephanou's experience in manufacturing operations and engineering qualifies him to serve as our director.

42.     Defendant R. Tony Tripeny ("Tripeny") has served as a member of the Board since May 2023.

43.     The Company's 2024 Proxy Statement stated the following about Defendant Tripeny:

R. Tony Tripeny served as a member of Origin's board of directors and Chair of the Audit Committee beginning May 1, 2023. He was appointed Chair of Board on March 1, 2024. Mr. Tripeny brings over three decades of significant operational, strategy, and M&A experience, extensive knowledge of the manufacturing, technology, and materials science industries, and a background in international corporate finance. Since 2022, he has served as a director at Mesa Laboratories, Inc., a global leader in the design and manufacturing of life science tools and critical quality control solutions. During his career with Corning, Incorporated, a global leading innovator in materials science, Mr. Tripeny held various, progressive leadership roles in the areas of corporate accounting and finance, including Executive Vice President, Chief Financial Officer from September 2015 to February 2022 and Senior Vice President, Corporate Controller and Principal Accounting Officer from April 2009 to August 2015. He also served on the board of Hardinge Inc., a multinational machine tool builder, from February 2012 to May 2018 and as a Financial Analyst for GKN Automotive Inc., an automotive technology company, from 1981 to 1985. Mr. Tripeny holds an economics degree from the University of Pennsylvania's Wharton School of Business and is a member of the Financial Executives Institute and the Institute of Management Accounting. We believe that Mr. Tripeny's leadership experience and knowledge of corporate finance qualify him to serve on our board of directors.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

44.     By reason of their positions as officers, directors, and/or fiduciaries of Origin and because of their ability to control the business and corporate affairs of Origin, the Individual Defendants owed Origin and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

45.     The Individual Defendants were and are required to use their utmost ability to control and manage Origin in a fair, just, honest, and equitable manner.

46.     The Individual Defendants were and are required to act in furtherance of the best interests of Origin and its shareholders to benefit all shareholders equitably.

47.     Each director and officer of the Company owes Origin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

48.     As fiduciaries of Origin, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

49.     The officers and directors of Origin were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

50.     Each Individual Defendant under his or her position as an officer or director of Origin, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

51.     As Origin's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

52.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interests of the Company.

53.     As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

54.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, and pursuant to Origin's Code of Conduct and internal guidelines;

b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and

to maximize the value of the Company's stock;

        c)     Remain informed as to how Origin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

        d)     Establish and maintain systematic, accurate records and reports of the business and internal affairs of Origin and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

        e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Origin's operations would comply with all laws and Origin's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        f)     Exercise reasonable control and supervision over the Company's officers' and employees' public statements and any other reports or information that the Company was required by law to disseminate;

        g)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        h)     Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants also bore a duty of loyalty to Origin and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

56.     During the pertinent times, the Individual Defendants served as agents for each other and for Origin, always operating within the parameters of their agency.

57.     The Individual Defendants, through their advisory, executive, managerial, and

directorial roles within Origin, were privy to detrimental, confidential information concerning the Company.

58.     Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Origin.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

59.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

61.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

62.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors or officers of Origin, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

63.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

64.     At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Origin, and at all times operated within the course and scope of that agency.

**ORIGIN'S CODE OF BUSINESS CONDUCT AND ETHICS**

65.     The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Origin's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

**INTRODUCTION**

We are committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer, and director to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors. For purposes of this Code, the Chief Compliance Officer (the "Chief Compliance Officer"), as further discussed in Section 16, shall be the Company's General Counsel. In the absence of the General Counsel, the Company's Chief Financial Officer, or such other designee as determined by the Board of Directors (the "Board") of Origin Materials, Inc. (the "Company") shall serve as the Chief Compliance Officer.

\*   \*   \*

The Code addresses conduct that is particularly important to proper dealings with people and entities with whom we interact but, reflects only a part of our commitment. From time to time we may adopt additional policies and procedures with which our employees, officers and directors are expected to comply, if applicable to them. However, it is the responsibility of each employee to apply common sense, together with his or her own highest personal ethical standards, in making business decisions where there is no stated guideline in the Code.

\*   \*   \*

**1.   Honest and Ethical Conduct**

It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

**2.   Legal Compliance**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Obeying the law, both in letter and in sprit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you do not hesitate to seek answers from your supervisor or the Chief Compliance officer (as further described in Section 16).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

**3.  Insider Trading**

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading Policy for more detailed information.

**4.  Corporate Opportunities**

You may not take personal advantage of opportunities for the Company that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information, unless authorized by your supervisor, the Chief Compliance Officer or the Audit Committee, as described in Section 7 above. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed line of business. Significant participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved. You may not use your position with us or corporate property or information for improper personal gain, nor should you compete with us in any way.

* * *

**8. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- No entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
- Transactions be supported by appropriate documents;
- The terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
- Employees comply with our system of internal controls; and
- No cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- No employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
- All employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel,

respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- No employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Chief Compliance Officer, the Audit Committee of the Board or one of the other compliance resources described in Section 16 or in accordance with the provisions of the Company's Whistleblower Policy on reporting complaints regarding accounting and auditing matters.

\* \* \*

**10. Fair Dealing**

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Chief Compliance Officer, as further described in Section 16.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

\* \* \*

**Clarifying Questions and Concerns: Reporting Possible Violations**

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Chief Compliance Officer; even the appearance of impropriety can be very damaging and should be avoided.

If you are aware of a suspected or actual violation of laws, regulations, the Code or any other Company policy, you have a responsibility to report it. You are expected to promptly provide a compliance resource with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation. Further, the Company encourages and expects each of us to report when we feel are being pressured to compromise standards that may lead to a potential violation. Please report these matters directly to your manager or the Chief Compliance Officer (jlee@originmaterials.com). We will take prompt disciplinary action against any employee who retaliates against you, including termination of employment.

\* \* \*

If any investigation indicates that a violation of the Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances. If we determine that n employee is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including termination of employment and, in appropriate cases, civil action or referral for criminal prosecution.

Appropriate action may also be taken to deter any future Code violations.

## ORIGIN'S CORPORATE GOVERNANCE GUIDELINES

66.    Origin's Amended and Restated Corporate Governance Guidelines (the "Guidelines") emphasize the Board's responsibility to ensure transparency, integrity, and accountability in all communications and disclosures made by the company. According to the Guidelines, the Board is explicitly tasked with overseeing management's performance and ensuring that stockholders' interests are protected:

### 1.    Role of the Board of Directors

Our stockholders select the Board to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise exercise his or her business judgment in the best interests of Origin and our stockholders. Service on the Board

requires significant time and attention on the part of directors. More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing Origin and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of Origin. Directors must participate at Board meetings, review relevant materials, serve on committees and prepare for meetings and discussions with management. We expect directors to maintain an attitude of constructive involvement and oversight, to ask relevant, incisive and probing questions and to require honest and accurate answers. Directors must act with integrity and we expect them to demonstrate a commitment to Origin, our values and our business and to long-term stockholder value.

***

## <u>ORIGIN'S AUDIT COMMITTEE CHARTER</u>

67.    In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Tripeny, Cook, Harvey, Rogerson, and Stephanou ("Audit Committee Defendants") owed specific additional duties to Origin. Specifically, the Audit Committee Charter states:

**PURPOSE AND POLICY**

The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Origin Materials, Inc. (the "Company") shall be to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (ii) the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (iii) the performance of the Company's internal audit function, and (iv) the review of any reports or other disclosure required by the applicable rules and regulations of the Securities Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein.

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication between the Committee and the Auditors and the Company's financial management and internal auditors.

*   *   *

**RESPONSIBILITIES**

The Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the Auditors. The Committee relies on the expertise and knowledge of management and the Auditors in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("*GAAP*"), preparing periodic reports, and for establishing and maintaining appropriate reporting. The Auditors are responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements. It is not the responsibility of the Committee to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and responsibilities with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock may be listed) deviate from the activities as appropriate under the circumstances.

**1. Evaluation and Retention of Auditors.**

To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality procedures and any material issues raised by that firm's most recent internal quality control review or any investigations by regulatory authorities.) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm, which retention shall be subject only to ratification by the Company's stockholders (if the Committee or Board elects to submit such retention for ratification by the stockholders).

**2. Communication Prior to Engagement**

Prior to engagement of any prospective Auditors, to review a written disclosure by the prospective Auditors of all relationships between the prospective Auditors, or

their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective Auditors the potential effects of such relationships on the independence of the prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("**Rule 3526**"), of the Public Company Accounting Oversight Board (United States) (the "**PCAOB**").

**3.  Approval of Audit Engagements**

To determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the adequacy of staffing, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation and execution, on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

**4.  Approval of Non-Audit Services**

To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid therefor, at the Company's expense, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

\* \* \*

**8.  Audited Financial Statement Review**

To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and any disclosure from the Company's chief executive officer (or each chief executive officer, if there are more than one) and the chief financial officer to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

**9.  Annual Audit Results**

To review with management and the Auditors, the results of the annual audit, including the Auditors assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

\* \* \*

**11. Quarterly Results and Reports on Form 10-Q**

To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's chief executive officer (or each chief executive officer, if there are more than one) and the chief financial officer to be made in connection with the certification of the Company's quarterly reports filed with the SEC, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601 (b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof).

**12. Management's Discussion and Analysis**

To review with management and the Auditors as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**13. Press Releases**

To review with management and the Auditors, to the extent appropriate, earnings press releases and earnings call script, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

**14. Accounting Principles and Policies**

To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under GAAP related material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

**15. Risk Assessment and Management**

To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures. Areas of focus shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. To provide oversight of climate-related risks and opportunities and monitoring the Company's compliance with ESG-related legal and regulatory requirements impacting the Company's accounting and financial reporting, including climate-related disclosures in the Company's financial statements. To review and discuss with management and the Auditors, as appropriate, the Company's non-financial risk exposures, including climate change, safety of the Company's manufacturing facilities, and cybersecurity risks.

\* \* \*

**20. Internal Control over Financial Reporting; Disclosure Controls**

To confer with management and the Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls. To obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies, responsibilities, budget and staff of the internal audit function and review of the appointment or replacement of the senior internal audit executive or manager.

\* \* \*

**25. Ethical Compliance**

To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related-party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.

* * *

**30. Report to Board**

To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

**31. Internal Control Report**

At least annually to obtain and review a report by the Auditors describing that firm's internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to one or more independent audits performed by the firm, as well as any steps taken to address the issues raised.

68.     Individual Defendants, because of their positions of control and authority as officers and/or directors of Origin, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Origin has needlessly expended and will continue to needlessly expend, significant sums of money.

## FACTUAL BACKGROUND

**Origin's Sustainable Materials Business**

69.     Origin was established in November 2008 and operates in California and Ontario, Canada. Its mission is to facilitate the global shift toward sustainable materials by replacing petroleum-based products with decarbonized alternatives. These materials are used in various industries,

including food and beverages packaging, clothing, textiles, plastics, automotive components, carpeting, tires, adhesives, and soil amendments.

70.     Origin's technology is designed to transform sustainable feedstocks – such as harvested wood, agricultural waste, wood waste, and corrugated cardboard – into materials and products that traditionally rely on fossil feedstocks like petroleum and natural gas. Unlike other sustainable materials companies that use feedstocks such as vegetable oils, high fructose corn syrup, or other sugars, Origin's approach does not compete with food production, setting it apart in the industry.

71.     Origin asserts that it has developed a proprietary platform technology capable of converting biomass, or plant-based carbon, into CMF and hydrothermal carbon (HTC), along with other versatile "building block" chemicals. The company aims to produce CMF and HTC at a commercial scale with a negative carbon footprint, claiming that these chemicals can serve as sustainable alternatives of petroleum-based counterparts. This, in turn, could reduce the carbon footprint of various materials without compromising performance or cost.

72.     Origin's manufacturing process for producing carbon-negative CMF and HTC involves three key stages: front-end feedstock handling, a liquid-phase reaction using Origin's proprietary catalyst mixture, and downstream separation processes. These steps work together to efficiently separate and purify CMF, HTC, and other co-products.

73.     CMF is a versatile chemical intermediate that can be converted into various products, including PX and FDCA. PX serves as a replacement for non-sustainable chemicals in existing supply chains for PET production, while FDCA is a precursor to PEF, a material with diverse applications. PET is widely used in packaging, textiles, automotive parts, carpeting, toys, and construction materials. Meanwhile, FDCA and PEF are utilized in surfactants, epoxy resins, and packaging, with PEF having the potential to compete with glass and aluminum.

74.     Fossil-based PET, derived from hydrocarbons, is one of the most widely used and recycled plastics globally. Origin aims to produce PET using sustainable, recyclable, and cost-competitive building block chemicals made from plant-based carbon. These bio-based alternatives are

designed to be identical replacements for fossil-based PET, offering a more sustainable solution without compromising performance or cost.

75.     Through the NaturALL Bottle Alliance research consortium, Origin has established strategic relationships with three of the world's largest PET buyers- Nestlé S.A. ("Nestlé"), PepsiCo, Inc. ("Pepsi"), and Danone S.A. ("Danone"). Collectively, these companies consumed 4.75 million metric tons of plastic annually as of 2021.

76.     PEF, derived from FDCA, is a potential alternative to PET, which is made from PX, particularly in small bottle applications due to their similar properties. PEF offers advantages such as requiring less material to achieve the same shelf life as PET and being biodegradable. However, its widespread adoption has been limited by cost constraints.

77.     HTC is a versatile, high-potential, carbon-negative material with a range of applications. Currently, Origin's HTC is used as a drop-in, energy-dense solid fuel. It can also be calcined to create a carbon-negative activated carbon for food and water treatment and filtration. Additionally, Origin is developing HTC for use as a carbon black replacement in tires, foams, dyes, paints, coatings, and agricultural and soil products. The company claims that its carbon black contains no detectable polyaromatic hydrocarbons, the carcinogenic compounds commonly found in carbon black derived from fossil feedstocks.

## SUBSTANTIVE ALLEGATIONS

**Origin Unveils its Plans for Commercial Plants and Emphasizes the Significance of Origin 2**

78.     Origin initially disclosed its strategic near-term and long-term plans in an investor presentation, which was attached to the Company's Form 8-K filed with the SEC on February 17, 2021. This was followed by the Company's subsequent S-4 Registration Statement filed with the SEC on March 9, 2021, and amendments filed with the SEC in connection with the Origin Merger on May 3, 2021.

79.     In the presentation, Origin stated that it was embarking on two major capital projects involving commercial-scale plants: "Origin 1" and "Origin 2." Origin 1 was expected to be operational by the end of 2022 and was under construction in Sania, Ontario, Canada. Origin 2 was projected to

be operational by mid-2025. Additionally, a third plant, "Origin 3," was anticipated to be launched in 2027.

80.    Origin's operating plan outlined that the Company would depend on the Origin 1 and Origin 2 plants to fulfill customer demand until 2027. Origin 2 would be responsible for supplying the majority of the Company's products from 2025 through 2027.

81.    Strategically, Origin 1 would cater to and develop long-term focus markets that would necessitate Origin's customers to reformulate existing products and applications. Meanwhile, Origin 2 would supply Origin's near-term focus markets at scale. Origin 2 was regarded as the significantly larger manufacturing plant.

82.    The Company also stated that Origin 2 would cost $1.07 billion. They did not anticipate generating any revenue until 2023 or achieving commercial-scale production and positive EBITDA until 2025. The completion of Origin 2 was crucial to Origin's financial success and served as proof of large-scale commercial production of its technology.

83.    During a conference call on February 17, 2021, held in connection with the Origin Merger, Defendant Riley emphasized the critical importance of Origin 2 for the Company:

> After years of running our pilot plants, we are excited that our first large scale plant, Origin One, is under construction and anticipated to be operation by the end of 2022. Origin Two will be much larger than Origin One and our first commercial scale plant. It is expected to come online in 2025, and by 2028 we expect to have four plants supporting more than $2 billion of annual revenue. In 2026, which is expected to be our first full year of full commercial scale operations, we forecast revenue of $830 million and EBITDA of $296 million.

84.    Defendant Riley added that "…the capital we are raising in this transaction is anticipated to fund our plan to finance the construction of Origin One and Origin Two and achieve EBITDA profitability."

/ / /

/ / /

/ / /

85.    During the call, Defendant Bissell highlighted the significance of its largest buyers, including Pepsi, and clarified that the Company's production focus in the coming years would be on PET, a product derived from PX:[1]

> As previously highlighted, our current order book sits at approximately $1 billion which includes take-or-pay contracts, capacity reservations or other contractual arrangements. Customers have already paid us large sums in advance, merely to reserve capacity on plants yet to be built… We have strategic relationships with three of the world's largest buyers of plastic- Nestle, Danone and Pepsi, who are all investors in the company. These companies have rigorously tested our technology and produced bottles using our materials, ensuring that Origin can meet their high standards. Notably, all three have signed offtake agreements worth several hundred million dollars and have representatives on our Board. To further size the opportunity, meeting the annual needs of these three companies alone could require more than 20 commercial facilities, representing a massive revenue opportunity.

> * * *

> While the flexibility of our platform enables us to address an incredibly wide range of materials, **the product that we will make from CMF initially is PET. PET is a very widely used material due to its beneficial properties, and importantly is the polymer with the largest and most established recycling infrastructure. Origin is the only company that can make PET that is chemically identical using a carbon negative process- not by buying offsets.**

**Origin Shares Detailed Information Regarding the Planning, Engineering, and Construction of Origin 2**

86.    In an analyst day presentation filed with the SEC on April 19, 2021 (the "April 19, 2021 Analyst Presentation"), Origin provided a detailed diagram outlining the scheduling for Origin 2's project development, engineering, procurement, construction, and front-end engineering design (FEED). This comprehensive schedule highlights the meticulous planning and coordination involved in bringing Origin 2 to fruition.

87.    The schedule for Origin 2 was repeatedly shared by Defendants in 2021 and 2022, as well as throughout the Relevant Period. This consistent dissemination underscores the importance of the project timeline.

---

[1] Emphases are added unless otherwise noted.

88.     The project development for Origin 2 needed to be completed before the front-end engineering design (FEED) could be finalized. Subsequently, the FEED had to be completed before the construction of Origin 2 could commence.

89.     In the intricate realm of chemical, oil & gas, and petrochemical plant development, front-end loading (FEL) is essential for establishing a project's success. This multi-phased process involves progressively refining the project scope, definition, and feasibility, ultimately paving the way for detailed engineering and construction. The FEL definitions provided here are utilized by engineers when planning a project like Origin 2.

90.     FEL is a structured approach to project development, consisting of three stages: FEL 1, FEL 2, and FEL 3. Each stage provides increasingly detailed information and serves as a decision-making point for project stakeholders. Origin issued project timelines to investors, indicating that it used the FEL approach for developing Origin 2.

91.     FEL 1 primarily aims to establish project feasibility and offer a high-level overview of its technical and economic viability. This includes defining the key process steps, flow diagrams, and mass and energy balances; developing a conceptual site layout and equipment arrangements; identifying the major equipment required for the project; estimating the project's capital and operating costs; creating a preliminary timeline for project execution; and identifying potential risks and mitigation strategies.

92.     FEL 1 is the phase where a project idea and its initial concept are tested for feasibility. It begins with identifying resources, estimating the rough cost of the project, and determining the sources of financing.

93.     FEL 2, or the pre-FEED study, builds on the foundation laid in FEL 1 and delves deeper into defining the project scope and technical specifications. This phase involves creating detailed process diagrams and specifying instrumentation requirements, refining the process design using advanced simulation software, developing detailed specifications for both major and minor equipment, completing a preliminary piping layout and estimating materials, developing preliminary designs for civil and structural elements, refining the electrical and instrumentation systems design, updating the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cost estimate with greater accuracy, defining the project schedule with a more realistic timeline, and conducting a more thorough risk assessment and developing a mitigation plan.

94.      FEL 3, also known as the FEED study, is the final and most comprehensive stage of the FEL process. It focuses on finalizing the project design and preparing a complete set of documents for bidding and construction. This stage typically involves finalizing all process-related drawings, specifications, and data sheets; completing all piping drawings, specifications, and isometric drawings; finalizing all civil and structural drawings and specifications; finalizing all electrical and instrumentation drawings and specifications; listing all materials required for construction; developing a comprehensive bid package for contractors; refining the cost estimate with a high degree of accuracy; and finalizing the project schedule with a detailed breakdown of activities.

95.      The FEED stage examines the technical requirements and provides a rough estimate of the overall project costs and the costs of each phase. During this stage, project partners work to address any potential risks and ensure that the FEED work includes extensive analysis and detailed data to inform the project's final investment decision (FID). Project owners and operators collaborate with the engineering contractor to determine the best technical and engineering options for the project.

96.      Once a company, such as Origin, successfully completes the FEED stage, it can proceed to make the FID. The FID is the point at which a company approves or sanctions the future development of a project. When a company makes an FID, it has given the green light for the project to move forward, allowing the construction process to begin.

97.      In 2021, Origin was working on executing FEL 1 for Origin 2 and had hired an engineering firm to assist with this phase in November 2021. While the company had completed certain aspects, such as a project schedule and cost estimate, many other aspects of FEL 1 still needed to be completed.

**Origin Confirms and Promotes Origin's 2's Focus on Producing PET**

98.      Along with outlining the schedule for Origin 2, Origin's April 19, 2021 Analyst Presentation indicated that the production focus for Origin 2 would be PET and HTC fuel.

99.     Origin highlighted its decision to focus on PET in numerous public statements before August 9, 2023.

100.    For instance, on May 25, 2021, Defendant Bissell emphasized the advantages of PET:

The reason why we went after PET first is, we're really solving the front end, which is when you make materials, you emit carbon. We thought if we can bring our platform to PET, you can take PET and you can make it so that it's carbon negative, instead of emitting carbon when it's produced, but there's the end-of-life consideration as well for all materials, not just plastics.

* * *

The reason why we went for PET is because PET has by far the best end of life answer for, frankly, I would say commodity materials generally, not even just plastics, and PET is substantially recycled. It's a great sort of material from a property perspective, so it has a strong desire for use as well. Our material drops directly into the PET recycling stream, so it goes straight in, it's the same stuff. You make it, and it's low carbon or carbon negative on the front end, and then it gets recycled and continues to be recycled.

101.    Defendant Bissell later emphasized the vast potential of PET, stating, "[e]ven just for PET, the market is so large that you're not even talking about dozens of plants. You're talking about scores, hundreds, in theory, of plants that are required, even at these very large scales in order to address these markets falling over time."

102.    In an article by Rebecca Coons for Chemical Week, titled "Origin Materials bets on decarbonization" that was filed with the SEC on form 425 on June 10, 2021, Defendant Bissell reiterated that Origin was prioritizing PET in the near-term due to the absence of market risk. Bissell stated, "[c]ustomers can use it in their existing supply chain, they don't have to redesign anything or retool anything." Bissell added "[t]hat means that we don't have to worry about adoption cycles."

103.    The article further discussed the market dynamics of PET:

Entering the market with PET —a high-volume, low-margin product —runs counter to many strategies in the biobased chemicals. "The question there is really one of economics, right?" Bissell says. "If you have a really low-cost platform, which we do, we get plenty of margin going after a large market like PET. And, let['s] be realistic: if your goal is to make an impact —because at the end of the day we are focused on making an impact, not just building an attractive business —picking a target that is

0.1% of the global materials market by volume . . . is not going to make a massive difference."

104.    During the Relevant Period, Defendants continued to promote the production of PX and PET. For instance, on February 23, 2023, Defendants informed the market that "due to strong customer demand," Origin was "substantially committed to our Origin 2 paraxylene and PET capacity."

105.    Similarly, on May 10, 2023, Defendants affirmed that PET derived from PX, was the "flagship" product for Origin 2 and emphasized the Company's process for producing a 'next-generation PET."

106.    On June 8, 2023, Defendants reiterated that PET derived from PX was the 'flagship' product for Origin 2. They further emphasized in their June 8, 2023 statements that the company's decision to focus on PET derived from PX "was very intentional" because it's one of the best polymers out there…"

**Defendants Closely Monitor Origin 2's Construction Timeline and Costs, and Reaffirm that the Plant is on Schedule to Open in Mid-2025**

107.    On August 12, 2021, Origin reported its first quarterly earnings as a public company for the second quarter of 2021. During an earnings call held that day, Defendant Bissell highlighted that the company's leadership was closely monitoring the construction timeline and costs of Origin 2:

> Now on to slide 8, I will turn our progress on Origin 1 and Origin 2. We are of course continually reviewing construction costs and timeline to assess macroeconomic perturbations such as inflation and supply chain disruption, we were pleased to reaffirm our previously disclosed expected capital budget and production timelines for Origin 1 and Origin 2.
>
> *    *    *
>
> …Similarly, Origin 2 remains on track for completion by mid 2025.

108.    During the call, Origin's Chief Financial Officer, Nate Whaley, emphasized the crucial role Origin 2 would play in the company's financial success. He stated, "[u]pon completion of Origin

1 and Origin 2, we expect to begin generating positive EBITDA and anticipate our business will generate sufficient cash to allow us to build Origin 3 and beyond. Hence, we do not anticipate needing to raise additional equity capital to fund our current business or capital project needs."

109.    Throughout the following year, Origin consistently confirmed that the company was on track to meet the goals set for Origin 2, including the plant's completion by mid-2025.

110.    In a November 12, 2021 press release attached to a Form 8-K filed with the SEC, announcing the company's financial results for the third quarter of 2021, Defendant Riley confirmed that "Origin 2 [will be] completed by mid-2025." The press release also stated that the company was "reaffirming the previously disclosed Origin 2 capital budget and production timeline" and appointing Worley Limited as its FEL 1 engineering partner for Origin 2.

111.    During the earnings call for the third quarter of 2021 held on the same day, Defendant Bissell reiterated, "Origin is reaffirming the previously disclosed capital budgets and production timelines for Origin 2…We continue to monitor construction costs and timelines to assess the impact of macroeconomic movements such as inflation and supply chain disruptions."

112.    Similarly, in a February 24, 2022 press release attached to a Form 8-K filed with the SEC, announcing the company's financial results for the fourth quarter of 2021, Defendant Riley stated that "Origin 2 remains on track to be operational by mid-2025. We announced that we have selected Geismar, Louisiana for Origin 2's location, subject to finalization of economic incentives, and are announcing today the selection of Hunt, Guillot & Associates as the project's owner's engineer."

113.    During an earnings call on the same day, Defendant Bissell emphasized that Origin 2 "remains on track to be mechanically complete and operational in mid-2025. Origin 2 will produce carbon negative materials used to make PET plastic." He further mentioned that Origin 2's "[f]ront end design is well underway and Origin expected detailed venture to begin in 2023."

114.    In relation to the Company's earnings report for the fourth quarter of 2021, Origin released a PowerPoint presentation on its website that detailed Origin 2's anticipated capacity: "[t]he

plant is expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC for a wide variety of end markets."

115.    Similarly, during Origin's May 9, 2022 earnings call for the first quarter of 2022, Defendant Bissell remarked: "[w]ith regard to Origin 2, our previously disclosed capital budget and construction timeline are unchanged. To be clear, we do see the inflationary environment and continue to closely monitor costs, but we are proactively managing our cost base and have built in substantial contingencies into our initial projections."

116.    During the call, in response to an analyst question concerning Origin 2's engineering and planning phases, Defendant Bissell stated:

> And then for Origin 2, we're in the front end engineering process right now. We're looking to have that process complete next year. At that point, once you have that, you can sort of bid out that the engineering package from the feed package from that process to get fixed pricing for it from EPCs. And then we can pull together the massive stack of contracts that we've put together. And then of course, feedstock supply agreements, all together into the project financing.

117.    Similarly, during Origin's August 3, 2022 earnings call for the second quarter of 2022, Defendant Bissell stated: "[w]ith regard to Origin 2, our previously disclosed capital budget, construction timeline, and financing are unchanged. As discussed on prior calls, we are closely monitoring costs associated with the current high levels of inflation and the challenging supply chain environment. We continue to proactively manage our cost base and note that we have built appropriate contingencies into our initial projection".

118.    Defendant Riley made similar statements during the Company's November 3, 2022 earnings call for the third quarter of 2022, stating that: "[f]or Origin 2, the previously disclosed capital budget, construction timeline, and financing assumptions are unchanged."

119.    During that same call, Defendant Bissell mentioned that although Origin 2 had advanced to the FEL 2 phase of development, Origin required more time than initially budgeted for value engineering to optimize the plant's scope:

…The team is optimizing and refining the scope and layout of the plant, incorporating value engineering activities. We are producing updated equipment arrangements and flow diagrams through our FEL 2 engineering contractor. While we had hoped to complete these tasks by the end of Q3, we decided that it was more important to expand on the value engineering work to get it done correctly upfront.

120.    Origin released PowerPoint presentations on its website alongside each of the Company's earnings reports from November 2021 through November 2022, as well as during the Relevant Period on February 23, 2023, March 7, 2023, and May 10, 2023. Each of these presentations confirmed that FEED for Origin 2 would be completed in early 2023, construction would commence by mid-2023, and start-up would occur in mid-2025.

**Defendants Knew that Fouling Issues Were Causing Delays in the Completion of Origin 2 and would lead to a shift in product focus away from PX**

121.    Without investors' knowledge, and both before and during the Relevant Period, Defendants were aware that Origin was grappling with fouling issues that impeded the Company's ability to finalize the PX-related chemistry for Origin 2, ultimately preventing the Company from advancing with the construction of Origin 2.

122.    According to a former Origin employee referred to herein as "CW1," by the end of 2022 or early 2023, Defendants knew that Origin was encountering issues related to the development of Origin 2, encompassing both the construction of the plant and the production of its target product, PX.

123.    CW1 was a technical development engineer employed at Origin before and during the Relevant Period. CW1 contributed to developing the technology for the fourth stage of converting CMF to PX for Origin 2. As a member of the internal engineering group, CW1 helped compile chemistry data provided by the Company's Research and Development ("R&D") group, then forwarded that information to Origin 1 for larger-scale testing. If those tests were successful, CW1 and the internal engineering team would subsequently pass the data to the external engineering firm responsible for compiling FEL 2 for Origin 2.

124.     Before the Relevant Period, in late 2022, CW1 discovered during biweekly meetings with Origin's R&D group that fouling issues were emerging at every stage of the Company's commercial-scale conversion of CMF to PX. These problems prevented the Company from finalizing the chemistry for Origin 2, thereby halting progress on building the plant. As a result of these fouling issues, CW1 and his team were delayed in delivering critical engineering data and designs to the external engineering firm responsible for FEL 2 for Origin 2, causing the Company to fall behind in its completion.

125.     In December 2022, CW1 attended a quarterly all-hands meeting led by Defendants Riley and Bissell. During the meeting, Defendants Riley and Bissell discussed the state of the Company, the research and development process at Origin 2, and provided an update on the plant's appearance. According to CW1, they revealed that the Company was already considering scaling down the size of Origin 2, dividing the plant's construction into two phases, and shifting Origin 2's focus from PX to another product. They further stated that the Company would either produce less PX at the plant or pivot production to another product due to the economics of PX. At the meeting, CW1 was informed that the Company was far from completing FEL 2 for Origin 2.

126.     In early 2023, CW1 learned during his biweekly meetings with Origin's R&D group that the Company encountered unexpected chemical issues critical for scaling commercial PX production. Although engineers initiated the development of solutions, the process required extra time, slowed down engineering designs, and increased costs, ultimately contributing to the decision to shift the plant's focus away from PX and transition Origin 2 into a two-phased project.

127.     CW1 stated that he knew management had already altered the timeline for Origin 2 before May 2023, as they were deliberately slowing down PX development for the plant. According to CW1, the primary hurdle to complete Origin 2 was achieving sufficient technology maturity. Initially, he even viewed the extended timeline as a benefit, since it allowed more time to address the technical challenges they were facing.

128.     CW1 stated that he attended weekly video conference meetings on Fridays between 9am and 10am PST with Bissell and others, which typically lasted an hour or more. The moderator

would begin with a safety moment, introduce new employees, and then proceed with the meeting. Bissell was usually one of the later speakers, with the moderator introducing him and outlining topics he planned to discuss. CW1 recalled that Bissell often led the discussions and also introduced other speakers and noted that Bissell was a "huge contributor" to the weekly meetings and "was in charge."

129.    During the March 3, 2023 meeting, CW1 heard Bissell announce that Origin 2 would now be divided into two phases, shift its focus to new products, and cease producing PX. Bissell communicated these changes to all participants. CW1 recalled that Bissell explained the changes by stating things such as: PX is not performing strongly, the cost of the plant is very high, and we need to get the company net positive. Notably, Bissell was the first person from whom CW1 heard that the Company would not produce PX at Origin 2.

130.    CW1 stated that during the March 3, 2023 meeting, Bissell presented a detailed plan of action outlining how to move forward with the changes at Origin 2 away from PX production and adjustments to plant construction. According to CW1, because this plan had already been formulated and communicated to the group at that time, Bissell must have known well before March 3, 2023 that Origin 2 would not produce PX. This early awareness would have allowed sufficient time for management to develop the new plan. CW1 further noted that the plan announced on March 3, 2023 was likely formulated months in advance, as it was very well thought out by the time it was conveyed to him and others.

131.    CW1 recalled that toward the end of March 2023, there were email communications within his group indicating that FEL 2 for Origin 2 had been delayed. CW1 noted that these late-March emails echoed what Bissell had already communicated during the weekly meetings- where Bissell discussed the changes in Origin 2's production away from PX, as well as delays in construction and FEL 2.

/ / /

/ / /

/ / /

**Origin's Offtake Agreements Further Demonstrate Defendants' Awareness of the Delay and Product Shift at Origin 2**

132.    Consistent with CW1's account, Origin's partnership, technology licensing, and offtake agreement with Avantium—as well as amendments made to an offtake agreement with Pepsi during the Class Period—further evidence that Defendants knew Origin was facing technical challenges in scaling PX production. These issues prevented the Company from achieving commercial production of PX, resulted in scheduling delays for Origin 2, and ultimately forced the Company to pivot the plant's focus to the production of FDCA.

133.    According to CW1, by early 2023, Defendants were aware that Origin was facing fouling issues that hindered the finalization of the chemistry for Origin 2 with respect to PX. This technical problem prevented the Company from proceeding with the construction of Origin 2. Consequently, Origin was compelled to explore alternatives to PX for Origin 2.

134.    Immediately before the Relevant Period, on February 21, 2023, while Origin was telling the market that "Origin 2's primary product focus would be PX," the Company entered into a partnership agreement with Avantium. This collaboration was aimed at accelerating the industrial-scale production of FDCA—the key building block of PEF—by converting sustainable wood residues via CMF into FDCA.

135.    Avantium is a technology development firm focused on renewable chemistry and is publicly traded on Euronext Amsterdam and Euronext Brussels under the symbol AVTX. In December 2021, the company announced it had reached its Final Investment Decision (FID) on its flagship plant, which will be the world's first commercial-scale facility to produce FDCA.

136.    Origin's collaboration with Avantium featured a non-exclusive license agreement that provided Origin with access to key elements of Avantium's process technology. This technology would enable Origin to convert its CMF derivatives into FDCA at an industrial-scale facility with a capacity of 100 kilotons per year, which Origin would operate. In addition, the agreement granted Origin a license to use certain components of Avantium's YXY® process for two main purposes: (1)

designing, constructing, and operating the licensed facility; and (2) producing, using, selling, and converting FDCA manufactured at that facility.

137.    Defendants understood that shifting from PX production to FDCA production depended on Avantium's technology and support, as explained by Avantium's CEO during a conference call with analysts on February 22, 2023:

> … The license agreement provides Origin access to relevant parts of Avantium's process technology to enable the conversion of CMF into FDCA at a facility of 100 kiloton per annum scale … ***Avantium will provide Origin Material for instance with a Process Design Package (PDP) and an operating manual. Avantium will also support Origin Materials during the FEED- (front-end engineering design) and EPC- (engineering, procurement and construction) phases, as well as the commissioning and start-up of the licensed facility.*** With this, Origin can design, construct and operate a 100-kiloton licensed facility and produce, use, sell FDCA that is manufactured at that facility.

*See*,        www.avantium.com/wp-content/uploads/2023/03/20230222-Transcript-Analyst-Call-Partnership-announcement-Origin-Materials.pdf.

138.    Avantium's CEO, widely recognized as the leading expert in developing FDCA plants globally, explained during the February 22, 2023 call that it would take Origin several years to implement FDCA into its Origin 2 plant design:

> **Tom van Aken (CEO Avantium):**
>
> …Let me go to the first question; basically what Origin has done so far, they have constructed what they call OM1, that is a plant that they are building in Sarnia in Canada. ***That has a capacity of 25kt that is input for feedstock and the output is 5kt of CMF but that is not sufficient to feed into the license facility that they intend to build with using our YXY technology. So that is material that will come from future plants.***
>
> **Fernand de Boer:**
>
> When is the OM2 coming into production then?
>
> **Tom van Aken (CEO Avantium):**
>
> That facility is going to be built in Geismar in Louisiana, and we have to be careful with what we are saying on behalf of Origin, so it's up to Origin to make the

1
2
3

announcement regarding the timing of OM2 and of the licensed facility. That is not something that we comment on. Of course, we have our own experience with this how long these things take, so this is not something that is going to happen over the next few years, but this is probably going to take a bit longer, but that is up to them to make further announcements on…

4
5
6

139.    On May 9, 2023, the Company and Pepsi finalized amendments to their offtake agreement (the "Pepsi Offtake Agreement Amendments"), significantly altering the terms of the original agreement established in 2018 (the "Original Pepsi Offtake Agreement").

7
8
9
10
11

140.    Under the Original Pepsi Offtake Agreement, Pepsi was granted a 5-year term to purchase a specified quantity of product annually from the Origin 1 facility, along with an additional 5-year term to purchase a specified quantity of product annually from the "New Plant." *See* Origin Form S-4 Registration Statement dated May 3, 2021 at 190. The agreement also specified that the "New Plant" (later clarified as Origin 2) would be constructed to produce PX.

12
13
14
15
16
17

141.    Under the Original Pepsi Offtake Agreement, Pepsi had the right to terminate the agreement if Origin 2 did not reach commercial operation by June 30, 2025—the same "mid-2025" timeline that the Company consistently communicated to the market before and during the Relevant Period – or if PX was not delivered from Origin 2 to Pepsi by September 30, 2025. Additionally, Origin was required to keep Pepsi "regularly informed" about the progress and any material events related to the construction of Origin 2 through regular progress reports.

18
19
20
21
22
23
24

142.    Under the Original Pepsi Offtake Agreement, if Origin became aware that there was a substantial likelihood that the milestone dates for Origin 2 in 2025 might not be met, Origin was required to promptly notify Pepsi. Additionally, Origin had to provide Pepsi with a reasonable estimate of the new expected timeline along with the measures being taken to ensure that the plant met its contractual deadlines. In this situation, Pepsi had the option to terminate the agreement, or the agreement would automatically terminate on June 30, 2025, unless the parties reached a new written understanding regarding Origin 2.

25
26
27
28

/ / /
/ / /

---

41
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

143.    The May 9, 2023 Pepsi Offtake Agreement Amendments modified the termination rights by extending the deadline for Origin 2's commercial operation to June 30, 2026, and by allowing termination if product was not delivered from Origin 2 to Pepsi by December 31, 2026.

144.    The Pepsi Offtake Agreement Amendments also allowed Origin to supply FDCA from Origin 2 to Pepsi, whereas the Original Pepsi Offtake Agreement only permitted Origin to provide PX from Origin 2.

145.    The Pepsi Offtake Agreement Amendments also incorporated new recitals and provisions that further demonstrate Defendants' awareness that the Company had shifted its priority toward producing FDCA and PEF at Origin 2:

**WHEREAS,** Supplier is focused on carrying out its strategic plan to accelerate the production of FDCA and PEF for advanced chemicals and plastics and accordingly is contemplating producing, or having produced, FDCA from intermediates produced at New Plant [(Origin 2)] and/or its subsequent plant, Origin 3.

146.    The Pepsi Offtake Agreement Amendments further outlined the following provisions for Origin 2: (i) the Company would provide Pepsi with pricing calculations and technical specifications for FDCA before or by the completion of the plant's FID, which the amendments recognized as incomplete and required approval by Origin's board of directors before engineering, procurement and construction could begin; (ii) upon completing FID, the Company would then provide Pepsi with an updated estimate on the specific allocation between PX and FDCA that the plant could produce on an aggregate and annual basis ("Origin 2's Offtake Volume"); (iii) Pepsi and Origin would meet at least quarterly, unless otherwise mutually agreed by the companies, to review Origin's progress and the steps the Company was taking to ensure Origin 2 was operational and delivering product by the new 2026 deadlines; and (iv) Origin was no longer required to produce PX at the plant.

147.    Origin's Form 10-Q for the first quarter of 2023, filed with the SEC on May 10, 2023 (the "1Q'23 form 10-Q"), summarized the Pepsi Offtake Agreement Amendment as follows:

On May 9, 2023, the Company amended its Offtake Agreement with a customer. The amendment added FDCA as a product potentially available to be supplied to the customer under the Offtake Agreement and eliminated the customer's obligation to buy

1
2
3
4
5
6
7
8
9
10
11
12

and the Company's obligation to sell a specified annual amount of product from the Origin 1 facility while adding the planned Origin 3 facility as a potential source of product to be supplied to the customer. The amendment also made the customer's obligation to buy and the Company's obligation to sell a specified annual amount of product from the Origin 2 facility non-binding unless and until the Company accepts a purchase order from the customer. In addition, the amendment eliminated certain construction and delivery milestones associated with the Origin 1 facility, along with the penalties applicable in the event those milestones were not met *and updated the construction and delivery milestones associated with the Origin 2 facility.*

* * *

On May 9, 2023, the Company amended its offtake agreement with a customer to, among other things, eliminate certain construction and delivery milestones associated with the Origin 1 facility, along with the penalties applicable in the event those milestones were not met, including the right to terminate noted above. *The amendment also updated the construction and delivery milestones associated with the Origin 2 facility such that the agreement now is terminable if commercial operation of Origin 2 has not occurred before June 30, 2026 or if delivery of product from Origin 2 has not occurred before December 31, 2026.*

13
14
15
16
17
18
19
20

148.    Thus, by May 9, 2023, Defendants were aware that Origin 2's schedule was delayed and that the plant's milestones for completion in mid-2025 and PX delivery in late 2025 would not be met. In line with Origin's agreement with Pepsi—one of the Company's key investors and customers, with a senior price president serving on Origin's Board of Directors—Origin informed Pepsi of the expected delay and amended the agreement to reflect a new timeline and a shift in product focus for Origin 2. Despite these changes, the Company continued to represent to the market that the plant's primary focus would be PX, that front-end design and construction planning were "progressing," that construction would commence by mid-2023, and that Origin 2 would be operational by mid-2025.

21
22
23
24

149.    Also, despite knowing that Origin was unable to effective scale the production of PX at Origin 2, which had caused delays and a total production realignment, Defendants repeatedly assured investors throughout the Relevant Period that Origin 2's operations date was on schedule for mid-2025 and would produce PX/PET.

25
26

150.    On August 9, 2023, Defendants finally disclosed what had been understood internally throughout the Relevant Period: Origin 2 would no longer produce PX/PET, but would switch to

27
28

FDCA/PEF, and it was impossible to design, construct, and start up a new FDCA/PEF plant by mid-2025. Consequently, construction of Origin 2 was delayed until at least 2025, and the earliest that certain aspects of the plant could become operational was pushed back to sometime between late 2026 and 2027.

151.    On the August 9, 2023 earnings call, Defendant Bissell acknowledged that once the Company decided to take Origin 2 in a new direction and focus on FDCA, the Company had to spend "thousands of hours" to complete a new engineering assessment and compile a revised estimate for the plant's cost and schedule—a process that played a "meaningful" role in delaying the plant's timing. Since Defendants made the decision in March 2023 to shift Origin 2 to new products and cease PX production, the completion of FEL 2 was delayed, and Defendants knew that extensive engineering work was necessary before the Company could provide a revised schedule for Origin 2.

152.    The change in production focus from PX to FDCA dramatically impacted the plant's original timeline, resulting in FDCA production being postponed until 2028—a delay of nearly three years.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

153.    On February 23, 2023, Origin filed a Form 8-K with the SEC that included a press release announcing the Company's financial results for the fourth quarter of 2022 and for the year ended December 31, 2022 (the "February 23, 2023 Press Release"). The press release also reported on the stated progress of Origin 2 and the possibility of incorporating new products for development at Origin 2, in addition to PX:

> The Company continues to make progress on front-end design, construction planning, and financing for Origin 2. The Company has also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF, as well as biofuels from an "oils and extractives" stream co-produced alongside CMF and HTC, which has not been included in previous plans. The Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

154.    Defendant Riley similarly asserted that Origin 2 was making progress, stating, "[F]or Origin 2, front-end loading, construction planning, and financing are progressing with an update to be provided mid-2023."

155.    On February 23, 2023, Origin held an earnings call with analysts to discuss its fourth quarter results (the "4Q'22 Earnings Call"). During the call, Defendant Riley reaffirmed the Company's primary focus on PET derived from PX for Origin 2 and explained the rationale behind considering the addition of new products to Origin 2's production slate:

>  As previously disclosed, due to strong customer demand, we are substantially committed for our Origin 2 paraxylene and PET capacity. As such, beginning in the fourth quarter, our sales and marketing team has shifted its focus from active marketing of PET towards higher-margin products such as carbon black and advanced CMF-derived products including FDCA and PEF for Origin 2 and beyond.
>
> * * *
>
> We continue to make progress on frontend design, construction planning, and financing. We have also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF as well as biofuels from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

156.    In connection with the earnings call, Origin made available a PowerPoint presentation on its website (the "4Q'22 Earnings Presentation") that featured slides outlining the Company's assertions that Origin 2's FEED package would be finalized in the coming weeks and that construction would commence in mid-2023.

157.    During the call, while referencing the slides, Defendant Bissell stated:

> …While Origin 1 is a substantial commercial plant, Origin 2 is expected to be much larger, with far greater economies of scale.
>
> * * *
>
> ***Turning to Origin 2 on Slide 11, we continue to make progress on the front-end design, construction planning, and financing of our second plant, to be built in Geismar, Louisiana.*** The overall site plot plan and logistics plan have been developed.

***Notably, we have made progress on developing new products and applications which may be incorporated into the design of that plant***, such as FDCA, PEF as well as biofuels from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the plant in mid-2023.

\* \* \*

I'd also like to provide you with some additional detail about what we're currently working on for Origin 2 in the area of product development. ***We have made progress developing new products and applications which may be incorporated into the design of Origin 2 such as FDCA, PEF, and biofuels.*** I highlight this because the markets for some of these new, functionally-advantaged products are showing up sooner than we initially anticipated. While we originally expected our Origin 1 product development activities to result in new, performance-advantaged products that we would make at Origin 3, we now believe that some of those products could be pulled forward meaningfully and produced at Origin 2 as well. We are pleased to potentially add some of these products into the demand slate of Origin 2.

\* \* \*

To summarize, I'm proud of how our team continues to execute against our Origin 1 and Origin 2 construction milestones.

158.    Also on February 23, 2023, Origin filed its Form 10-K for fiscal year 2022 (the "2022 10-K") with the SEC. The 2022 10-K was signed by Defendants Bissell, Riley, Cook, Fish, Harvey, Richardson, and Drucker. With respect to Origin 2, the 2022 10-K reiterated the same progress representations, stating: "[w]e continue to make progress on front-end design, construction planning, and financing."

159.    Analysts following the Company interpreted Defendants' representations regarding the "progress" on Origin 2's front-end design and construction planning as indicating that the plant was on track to open on schedule—in 2025—and to be completed within the forecasted cost of $1.07 billion.

160.    On February 24, 2023, Craig Stines, an analyst at Craig-Hallum Capital Group LLC ("Craig-Hallum"), reported that: "[t]he company expects to provide an update in mid-2023 on Origin 2 (2.4B pounds) in Geismar, LA, where front-end design, construction planning, and financing are progressing toward current planned start-up in mid-2025 with expected CapEx of $1.1B."

161.    Defendants' statements set forth above  –  that the Company was making "progress" on Origin 2's front-end design and construction planning – were materially false and misleading when made. They failed to disclose key facts regarding the true status of Origin 2, namely that the plant was encountering significant scaling issues in converting CMF to PX, which increased costs and delayed development. Specifically, Defendants did not reveal that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) Defendants had already decided to abandon PX at Origin 2 and prepared a plan of action, which they presented at the March 3, 2023 meeting, to change the plant's production focus and construction strategy; and (e) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2. Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline.

162.    The statements – that Origin 2's FEED was nearing completion and that construction would start by mid-2023 – were materially false and misleading because Defendants knew that that (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2, (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product, (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs, (d) Defendants had already decided to abandon PX at Origin 2 and prepared an alternative plan of action, which they

presented at the March 3, 2023 meeting, to change the plant's production focus and construction strategy, and (e) that in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2. Furthermore, Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline.

163.    The 2022 10-K, filed on February 23, 2023, also included risk disclosure language related to the construction of new plants, including Origin 2:

> ***Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects.***
>
> … The construction and commission of any  new project is dependent on a number of contingencies some of which are beyond our control. ***There is a risk that significant unanticipated costs or delays could arise due to***, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, ***unforeseen technical issues*** or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.

164.    The warnings regarding the construction of new plants, including Origin 2, were materially false and misleading because they omitted the fact that certain risks – including but not limited to unforeseen delays and technical issues – had already occurred and adversely affected the planned construction and completion of Origin 2. Specifically, Defendants failed to disclose that (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2, (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product, (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the

additional work further delayed Origin 2's engineering designs and increased its costs, (d) Defendants had already decided to abandon PX at Origin 2 and prepared a plan of action, which they presented at the March 3, 2023 meeting, to change the plant's production focus and construction strategy, and (e) that in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2. Furthermore, Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline.

165.    On March 7, 2023, Origin published a PowerPoint presentation on its website providing an update and overview of the Company (the "March 7, 2023 PowerPoint"). The presentation offered a comprehensive update on Origin 2 and included slides that falsely represented that the plant's FEED package was about to be completed, that construction would start by mid-2023, and that it would solely produce PET and HTC.

166.    The assertions – that Origin 2's FEED was nearing completion and that construction would commence by mid-2023—were materially false and misleading when made, because Defendants were aware that (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2, (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product, (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs, and (d) that in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2. Furthermore, Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline. Moreover, at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was

being divided into two phases, its product focus was shifting to new offerings, and it would no longer

produce PX, a change that further delayed the completion of FEL 2 for the plant.

167.    On May 10, 2023, Origin filed a Form 8-K with the SEC that included a press release

announcing the Company's first-quarter 2023 financial results (the "May 10, 2023 Press Release"). In

the release, Defendant Riley stated that: "[f]or Origin 2, front-end design, construction planning, and

financing are progressing, and we expect to provide an update during our Q2 earnings call in August."

The press release also mentioned that new productions might be incorporated into Origin 2, in addition

to PX:

> For Origin 2, the Company continues to make progress on front-end design,
> construction planning, and financing. The Company has also made progress developing
> new products and applications that may be incorporated into the design of the plant,
> including FDCA, PEF, and biofuels. The Company expects to provide an update on
> new product offerings and construction plans for the Origin 2 plant in August 2023.

168.    On the same day, Origin held an earnings call with analysts to review its first-quarter

results (the "1Q '23 Earnings Call"), during which Defendant Riley once again reaffirmed that the

Company was continuing to make progress on FEED and construction planning for Origin 2:

> Third, we continue to make progress on the front-end design, construction planning,
> and financing of Origin 2. We continue to expect that Origin 2 can be fully funded from
> a combination of existing cash on hand, previously indicated traditional project
> financing, and potential strategic partnerships. We plan to provide an update on new
> product offerings and construction plans for the Origin 2 plant in August 2023 during
> our Q2 earnings call.

169.    During the 1Q '23 Earnings Call, Defendant Bissell also underscored that the Company

was making continuous progress on Origin 2, highlighting its ability to meet its milestones:

> Regarding Origin 2, our second plant to be built in Geismar, Louisiana, we continue to
> advance for design, construction, planning, and financing. We continue to make
> progress developing new products and applications, which may be incorporated into
> the design of the plant such as FDCA, which can be converted to [P]EF and carbon
> black biofuels. We expect to provide an update on new product offerings and
> construction plans for the plant in August 2023.

*   *   *

To summarize, *I'm proud of how our team continues to execute against our Origin 1 and Origin 2 milestones.*

170.    Also on May 10, 2023, Origin filed its 1Q '23 Form 10-Q with the SEC. In connection with Origin 2, the Form 10-Q reiterated the same representation of progress, stating: "[w]e continue to make progress on front-end design, construction planning, and financing."

171.    Analysts and the market interpreted Defendants' representations that the Company was making "progress" on Origin 2 to indicate that the plant was on track to open as scheduled in mid-2025.

172.    For example, a May 11, 2023 article by Eric Stine and Aaron Spychalla from Craig-Hallum, titled "Commercial Momentum As Strong As Ever With Origin 1 Start-Up Imminent & Origin 2 On Track. Maintaining BUY Rating," stated: "[l]ooking beyond the near-term, ORGN also continues to take needed front-end design and engineering steps and along with the financing needed for planned Origin 2 completion in 2025."

173.    Defendants' statements above, which claimed that the Company was making "progress" on Origin 2's front-end design and construction planning, were materially false and misleading when made. They failed to disclose crucial information regarding the true status of Origin 2 – that the Company would be unable to meet its long-promoted schedule because of a shift in the plant's product focus. Specifically, Defendants failed to disclose that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2; (e) Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but

would require several additional years beyond the plant's originally projected timeline; (f) that at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to new offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2 for the plant; (g) that by May 9, 2023, Defendants knew that construction for Origin 2 would not begin by mid-2023 and that the plant would not be operational by mid-2025, so they amended the Original Pepsi Offtake Agreement to reflect these delays, (h) that once the Company decided to shift Origin 2 in a new direction, it had to invest "thousands of hours" into preparing a new engineering assessment and compiling a revised estimate for the plant's cost and schedule—an effort that played a "meaningful" role in delaying the plant's timeline; and (i) that since Defendants decided by March 3, 2023 to shift Origin 2 to new products and discontinue PX production, the completion of FEL 2 was delayed, and they knew that extensive engineering work was required before the Company could provide any reasonable estimate for a construction start date or start-up timeline.

174.    The 1Q '23 Form 10-Q also included risk disclosures regarding the construction of new plants, including Origin 2:

> ***Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects.***
>
> … The construction and commission of any new project is dependent on a number of contingencies some of which are beyond our control. ***There is a risk that significant unanticipated costs or delays could arise due to, among other things***, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, ***unforeseen technical issues or increases in plant and equipment costs***, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.
>
> \*   \*   \*
>
> We have not produced our products in large commercial quantities.

We have no experience in producing large quantities of our products. While we have succeeded in producing small amounts of our products in our pilot plant for customer trials and testing purposes, we have not yet commenced large-scale production. There are significant technological and logistical challenges associated with producing, marketing, selling and distributing products in the specialty chemicals industry, including our products, and we may not be able to resolve all of the difficulties that may arise in a timely or cost-effective manner, or at all. While we believe that we understand the engineering and process characteristics necessary to successfully build and operate our additional planned facilities and to scale up to larger facilities, we may not be able to cost-effectively manage production at a scale or quality consistent with customer demand in a timely or economical manner.

* * *

***Maintenance, expansion and refurbishment of our facilities, the construction of new facilities and the development and implementation of new manufacturing processes involve significant risks.***

… The construction of new manufacturing facilities entails a number of risks and assumptions, including the ability to begin production within the cost and timeframe estimated and to attract a sufficient number of skilled workers to meet the needs of the new facility. Additionally, our assessment of the projected benefits associated with the construction of new manufacturing facilities is subject to a number of estimates and assumptions, which in turn are subject to significant economic, competitive and other uncertainties that are beyond our control. ***If we experience delays*** or increased costs, our estimates and assumptions are incorrect, or other unforeseen events occur, ***our business, ability to supply customers, financial condition, results of operations and cash flows could be adversely impacted.***

***Finally, we may not be successful or efficient in developing or implementing new production processes. Innovation in production processes involves significant expense and carries inherent risks. Such risks may include difficulties in designing, developing, implementing, and scaling up new process technologies, development and production timing delays***, lower than anticipated manufacturing yields, product defects, and inability to consistently meet customers' product specifications, performance and carbon intensity, or cost requirements, among others. Errors, defects in materials, operating permit and license delays, customer product returns, interruption in our supply of materials or resources, and disruptions at our facilities due to accidents, maintenance issues, or unsafe working conditions, all could affect the timing, efficiency, or success of our production processes. ***Such production issues can lead to increased costs and may affect our ability to meet product demand, which could adversely impact our business and results from operations.***

175.    The warnings regarding the Company's construction of new plants, including Origin 2, were materially false and misleading because they omitted that certain risks – including but not limited

to unforeseen delays and technical issues – had already materialized and adversely affected the planned

construction and completion of Origin 2. Defendants failed to disclose that: (a) in late 2022, Origin

was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of

CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering

development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley

informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was

forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023,

while Origin's R&D began developing solutions to these chemical issues, the additional work further

delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had

entered into a deal with Avantium to produce FDCA at Origin 2; (e) that Avantium, the preeminent

expert in commercial-scale FDCA production, had advised that Origin 2 would not become

operational within two years but would require several additional years beyond the plant's originally

projected timeline; (f) that at an internal meeting on March 3, 2023, Defendants Bissell and Riley

acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to new

offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2

for the plant; (g) that by May 9, 2023, Defendants knew that construction for Origin 2 would not begin

by mid-2023 and that the plant would not be operational by mid-2025, so they amended the Original

Pepsi Offtake Agreement to reflect these delays; (h) that once the Company decided to shift Origin 2

in a new direction, it had to invest "thousands of hours" into preparing a new engineering assessment

and compiling a revised estimate for the plant's cost and schedule—an effort that played a

"meaningful" role in delaying the plant's timeline, and (i) that since Defendants decided by March 3,

2023 to shift Origin 2 to new products and discontinue PX production, the completion of FEL 2 was

delayed, and they knew that extensive engineering work was required before the Company could

provide any reasonable estimate for a construction start date or start-up timeline.

176.    On May 10, 2023, Defendants Bissell and Riley took part in a fireside chat at the UBS

Sustainable Packaging Materials ESG Virtual Conference (the "May 10, 2023 Fireside Chat"), which

the Company made available to investors on its website. At the outset of the chat, Defendant Riley

stated that PET derived from PX remained the Company's flagship product, saying, "…our flagship material is PET plastic, which is chemically identical to fossil-based PET plastic…."

177.    During the May 10, 2023 Fireside Chat, Defendant Bissell extolled Origin's decision to focus on the production of PX/PET:

> …So the PET – when we're making PET, right? Obviously, we can talk about all kinds of different products, but we'll keep it to PET in polyester. When we're making PET, it's identical to PET that's made for fossil materials. So that's brilliant. Recycles the same way. It's the same quality as Origin Material, et cetera. So it's sort of a great add. We kind of think of it as the system you want ideally is you have carbon-negative PET going into the system, which is then subsequently recycled indefinitely, right? That's sort of the ideal version. And then actually, when we make some – we make like a next-generation PET that has better performance in a whole bunch of areas. For that PET that's actually recyclable as well….

178.    Defendants' statements above, which promoted the Company's process for producing PET from PX and claimed that its "flagship" product was PX, were materially false and misleading when made because they failed to disclose that the focus of Origin 2 had shifted to the production of FDCA and that the plant was no longer producing PX. Specifically, Defendants failed to disclose that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2; (e) Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline; and (f) at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to

new offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2 for the plant.

179.    On May 12, 2023, Origin released a PowerPoint presentation on its website providing an overview and update on the Company (the "May 12, 2023 PowerPoint"). This presentation included an update on Origin 2 and featured a slide that falsely indicated the plant's construction would imminently begin by mid-2023, it would open in mid-2025, and it would exclusively produce PET and HTC.

180.    The statements—that Origin 2's construction would start by mid-2023, the plant would be operational by mid-2025, and its product focus would remain on PET derived from PX—were materially false and misleading when made because Defendants knew that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2; (e) Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline; (f) at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to new offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2 for the plant; (g) by May 9, 2023, Defendants knew that construction for Origin 2 would not begin by mid-2023 and that the plant would not be operational by mid-2025, so they amended the Original Pepsi Offtake Agreement to reflect these delays; (h) once the Company decided to shift Origin 2 in a new direction, it had to invest "thousands of hours" into preparing a new engineering assessment and compiling a

revised estimate for the plant's cost and schedule—an effort that played a "meaningful" role in delaying the plant's timeline; and (i) since Defendants decided by March 3, 2023 to shift Origin 2 to new products and discontinue PX production, the completion of FEL 2 was delayed, and they knew that extensive engineering work was required before the Company could provide any reasonable estimate for a construction start date or start-up timeline.

181.    On May 22, 2023, during a fireside chat at the Morgan Stanley 8th Annual Sustainable Futures Conference – which the Company shared with investors on its website – Defendants Bissell and Riley participated. At the outset of the discussion, Defendant Riley reiterated Origin 2's 2025 timeline, stating, "[a]nd then our much larger and first world-scale plant Origin 2, is scheduled to come online in the 2025 time frame in Geismar, Louisiana."

182.    Later during the chat, Defendant Riley touted Origin's process for PET:

Another partnership just highlight that we announced under recently Indorama. Indorama is the world's largest maker of PET plastic, but not everybody has heard of them in the U.S. markets, but a very natural partnership for us. If you think about what leaves our plants is the paraxylene component of PET and then partnering with someone like Indorama to convert that further into PET, makes a lot of sense. They have a lot of the customer relationships and stuff like that. And so I think you'll see us continuing to do strategic partnering like that, where we stay as far upstream as we can and then partner with sort of best-in-class partners to deliver to the end markets.

183.    Similarly, Defendant Bissell remarked:

…More specifically, I think there are a bunch of sort of tactical issues around it, like if you're looking at mechanically recycled PET, which is the majority of recycled PET by far, the quality is just not quite the same as new material that we can make.

And so that makes a difference for a lot of customers for them to be able to get the quality of product that they want. They need to be able to use new stuff. They can't use mechanically recycled materials. We tend to have a lower carbon footprint. In fact, not tend to. I don't know of any recycled PET that has a lower carbon footprint than the stuff that we can make. So there's a trade-off in terms of the carbon impact and circularity. Again, I think that's not so much a concern because all of it is going to get consumed, but what we can make, and the recycle material, but it does make for a trade-off for customers. Geographic flexibility and scale can make a difference.

184.    The statements above asserting that Origin 2 would open in mid-2025 and that the Company's process for producing PET from PX was viable were materially false and misleading when made because Defendants knew and/or failed to disclose that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2; (e) Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline; (f) at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to new offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2 for the plant; (g) by May 9, 2023, Defendants knew that construction for Origin 2 would not begin by mid-2023 and that the plant would not be operational by mid-2025, so they amended the Original Pepsi Offtake Agreement to reflect these delays; (h) once the Company decided to shift Origin 2 in a new direction, it had to invest "thousands of hours" into preparing a new engineering assessment and compiling a revised estimate for the plant's cost and schedule—an effort that played a "meaningful" role in delaying the plant's timeline; and (i) since Defendants decided by March 3, 2023 to shift Origin 2 to new products and discontinue PX production, the completion of FEL 2 was delayed, and they knew that extensive engineering work was required before the Company could provide any reasonable estimate for a construction start date or start-up timeline.

185.    On June 8, 2023, during a fireside chat at TD Cowen's Sustainability Week Conference – which the Company shared with investors on its website – Defendants Bissell and Riley participated.

At the outset, Defendant Riley asserted that PX remained the Company's flagship product and described the process of converting CMF to PX and subsequently to PET as a "highly efficient platform technology":

> So Origin, we've spent over 10 years developing a highly proprietary technology platform that really has created a new fundamental chemical building block called CMF, chloro-methyl-furfural. And we set up from day one to be cost competitive with oil while using cellulose as our feedstock. So think the waste coming off a sawmill, agricultural waste as a feedstock we take in.
>
> Highly efficient process that basically retains every carbon atom as a soluble product and produces three core intermediates, CMF, which I mentioned, which can go on to our flagship product, para-xylene, which go into PET plastic for example, which is a $100-billion market opportunity; solid called hydrothermal carbon, which can be used to make carbon black, which can go into tires and other things like that, and in the biofuel stream.
>
> And so highly efficient platform technology. Pepsi, Nestlé, and Danone were early investors in the company, joined our Board and helped prove our materials all the way through to food-grade PET plastic, which was a significant milestone in our development.

186.    During the June 8, 2023 Fireside Chat, Defendant Bissell lauded Origin's decision to concentrate on producing PET derived from PX:

> …I think the way to think about PET first is PET fits the end-of-life criteria and frankly, a lot of the application criteria, really, really well. So it is a very usable plastic. It doesn't have a lot of additives in it which costs sort of human health concerns and the same that you might see with polycarbonates or PVC or [methane] or something like that. And so it is sort of the plastic you want to go to that actually makes that data. You want to use this kind of plastic relative to other kinds of materials out there. It has great properties in terms of transparency. It's strong. It can work as a fiber. It's just a great material.
>
> From an end-of-life perspective, it already has the largest recycling stream of any plastic, of any organic material -- or actually, synthetic organic material. And so it's really in a great spot from an end-of-life perspective, but we need to get better. Our view was if we're going to bring our platform, which is a pretty broad-based, carbon-negative platform, to a particular polymer, particular material; first, we wanted to take something that was already the best out there and we make it better. We weren't going to try to sort of drag up one of the less performance materials and try to make it average.

***And so for us, going into PET was very intentional.*** Again, it's one of the best polymers out there from a performance perspective. It's clearly the best from an end-of-life perspective, then what we do is we make it carbon negative.

And that's important because even if we got -- as a species, we got spectacular at capturing and recycling all of our PET and all of our materials, a lot of our materials are going into durable applications. Stuff that isn't getting used once and thrown away. And so, we are throwing away as much material as we consume to make stuff. And so consequently, you're always going to have to make a lot of material.

Things like a t-shirt or apparel are often made of polyester, that's sort of the dominant material to expand supply of textiles. And ideally, you're not throwing those things away after one use. Something's gone horribly wrong if you throw it away after one year. And so we need ways to make these materials. Our view is take the best material that we can make, make it in a carbon-negative way, and then reuse it indefinitely.

187.    Later in the chat, when a TD Cowen analyst asked about Origin's near-term focus on PET production, Defendant Riley reiterated that PX remained the Company's flagship product:

**Thomas Boyes - TD Cowen – Analyst:**
Great. And you touched upon this at the beginning of the call here. What are the different opportunities for CMF and HTC? In the near term, it sounds like it's PET, fuel pellets, activated carbon; and longer-term, PEF, carbon black, and agriculture. Like how do you think about those different opportunities as far as which one is the kind of the largest component of that and how do you think that develops over time?

**Rich Riley - Origin Materials, Inc. - Co-CEO:**

Yes, so CMF and HTC are both really important intermediates for us. So it's -- I make the analogy sometimes to gasoline and diesel -- Yeah. Big fractional components coming out of a refinery. If you want to be selling both to the high side, but you can't. So we sort of don't have a favorite child.

CMF, as you said, para-xylene, which hopefully goes into PET, is kind of our flagship and our first product. It's effectively an unlimited market for our purposes. The great spot to be for all the reasons that I mentioned earlier....

188.    The statements above, which described the Company's process for converting CMF to PX as a "highly efficient platform technology" and asserted that its "flagship" product is PX, were materially false and misleading when made because Defendants failed to disclose that: (a) in late 2022, Origin was experiencing unforeseen fouling issues "at every step" of the commercial-scale conversion of CMF to PX, preventing the finalization of the chemistry for Origin 2 and delaying its engineering

development and the completion of FEL 2; (b) in December 2022, Defendants Bissell and Riley informed Origin's employees in a meeting that due to the economics of scaling PX, the Company was forced either to produce less PX or to pivot the plant's production to another product; (c) in early 2023, while Origin's R&D began developing solutions to these chemical issues, the additional work further delayed Origin 2's engineering designs and increased its costs; (d) in light of these issues, they had entered into a deal with Avantium to produce FDCA at Origin 2; (e) Avantium, the preeminent expert in commercial-scale FDCA production, had advised that Origin 2 would not become operational within two years but would require several additional years beyond the plant's originally projected timeline; (f) at an internal meeting on March 3, 2023, Defendants Bissell and Riley acknowledged that Origin 2 was being divided into two phases, its product focus was shifting to new offerings, and it would no longer produce PX, a change that further delayed the completion of FEL 2 for the plant; and (g) by May 9, 2023, Defendants knew that construction for Origin 2 would not begin by mid-2023 and that the plant would not be operational by mid-2025, so they amended the Original Pepsi Offtake Agreement to reflect these delays.

## THE TRUTH EMERGES

189.    On August 9, 2023, Origin surprised the market by reporting its second-quarter 2023 financial results and revealing that Origin 2 was not, in fact, on track for a mid-2025 start-up as previously stated. The disclosure further indicated that the plant would be built on a smaller scale than earlier represented, would cost more, and would no longer produce its previously reported target product, PX.

190.    Specifically, Origin issued a press release in which Defendant Riley disclosed for the first time that the primary production focus for Origin 2 would be FDCA, that the plant would no longer produce PX and PET, and that its construction would be divided into two phases – with Phase 1 projected to start up between late 2026 and 2027 and Phase 2 deferred to 2028:

> …[W]e are updating the product slate at our second commercial plant, Origin 2, to focus on the production of FDCA, for which we have seen much greater demand than anticipated, as we indicated in February. While we initially expected Origin 2 to primarily focus on para-xylene ('pX') production for bio-PET, we have made

significant progress in FDCA product development and commercialization and we now plan to bring FDCA forward to Origin 2, rather than at our third planned commercial plant, Origin 3, as initially reported in 2021.

FDCA is a highly strategic focus for our platform, as its applications tend to offer performance advantages, higher margins, and thus higher value uplift for our platform intermediate, CMF. …we are revising the plant's outlook and introducing a phased approach to construction. We expect that adapting in this manner to the high-cost environment will reduce project risk as we move forward on the path to profitability, with Phase 1 start-up projected for late 2026 to 2027 and Phase 2 start-up projected for 2028.

191.    Pertaining to the increased cost of completing Origin 2, the press release revealed that, in accordance with the Pepsi Offtake Agreement Amendments, the Final Investment Decision (FID) would not be reached until 2025, meaning that construction could not begin until later in 2025, at the earliest:

The capital budget for Phase 1 of Origin 2 is expected to be up to $400 million while the capital budget for Phase 2 is projected to be up to $1.2 billion. This compares to the original $1.07 billion aggregate capital budget estimate originally provided in February 2021.… The Company expects capital expenditure of up to $50 million for 2024, with the majority of Origin 2 capital spend to occur following the project's final investment decision ("FID") in 2025.

192.    On August 9, 2023, during the 2Q '23 Earnings Call, Defendant Bissell stated that rather than simply adding FDCA as an additional product, FDCA will now be the primary product produced at Origin 2:

…Origin 2 will focus primarily on FDCA production…our current plan is a rational prioritization of Origin's researches towards more profitable, typically performance-enhanced chemical applications [at] Origin 2…

193.    Regarding the updated timeline for Origin 2, Defendant Bissell further stated:

…[W]e now expect Origin 2 to be completed in 2 phases with Phase 1 estimated to be completed in late 2026 to 2027 and Phase 2 estimated to be completed in 2028 compared with our initial expectation for a mid-2025 completion. During Phase 1, the company expects to achieve profitability from its oils and extractives stream. From this stream, Origin plans to produce a drop-in biofuel with potential applications, including marine fuel and heat and power generation.…

Phase 2 will expand production to include the mass production of platform chemicals, CMF and HTC…

194.    During the 2Q '23 Earnings Call, Steve Byrne, an analyst with Bank of America, asked Defendant Bissell to elaborate on the factors that drove Origin's delay and the increase in costs:

I want to -- a couple of questions here on Origin 2. Is any of the delay in the cost increase because of shifting the focus away from paraxylene over to FDCA? I kind of suspect not, but I wondered if that was part of it. And maybe more importantly, when you first rolled out your financials for Origin 2, you were targeting 1 million tons of biomass feedstock into that plant. Is that still the design? But more importantly, you were targeting $0.16 a pound of margin from this PET pathway. As you move towards more of an FDCA pathway, what would you suggest is a more reasonable margin that, that plant you think is going to be able to produce?

195.    In response, Defendant Bissell acknowledged that the shift to FDCA played a "meaningful" role in both delaying Origin 2's timeline and increasing its cost, and he revealed that the scale of Origin 2 had been reduced by half:

…So first, you asked is FDCA and shifting towards that kind of product base part of the capital increase and schedule shift. And the answer actually is, in part, yes. It's not the only thing, but it's meaningful. So looking at these other products, one, takes more time, right? So we obviously didn't expect to be producing those kinds of products off of OM2 when we originally provided our estimates on schedule and cost. And so there are changes that get made. I'd say, generally speaking, if you're looking at FDCA, that has more of a schedule impact than it does an overall cost impact. And then for things like carbon black and other higher-value HTC products, that has both a schedule and a cost impact. So those are a part of it, although, again, they're not the only things. They're not solely responsible for that.

*   *   *

And so consequently, in a higher cost environment where we're going in general, right, which includes some of the things that we enumerated but things like higher material prices, obviously higher labor costs, energy, all sorts of things like that, as a consequence of those, we need to adjust by scoping down the scale of the plant. And so we expect that we're going to have a smaller-scale plant than the 1 million tons of biomass fed originally. And we provide a summary of that on one of the appendix slides in our earnings presentation. But generally speaking, we're expecting, by the time we're done with this plant, to be at about 500 KTA of feedstock rather than 1 million.

1    196.    During the same call, Eric Stine, an analyst with Craig-Hallum, asked Defendant

2    Bissell to elaborate further on the factors contributing to Origin 2's delay:

3        Got it. And then just as we think about the change in the timeline, I can appreciate
4        obviously higher interest rates. But that's a new dynamic since this all got started and
         you first gave that number for Origin 2 back in 2021, but it's not, again, new here over
5        the last number of quarters. So I'm just trying to kind of think about how much of this
         can be ascribed to that, a higher rate environment versus, as you said, it's FDCA, you
6        just need -- more time needed on the development side.

7
8        197.    In response, Defendant Bissell confirmed that once the Company shifted Origin 2's

9    focus to FDCA, an enormous amount of work was required to rework the plant's engineering and

10   design and to calculate a revised forecast for its cost and schedule. However, he misleadingly implied

11   that the decision to pivot to a new product focus was made very recently:

12       Yes. So really, I think -- the first thing that's worth thinking about is -- and keeping in
         mind is, how long it takes to turn a new engineering assessment? And so as we have
13       made adjustments and thought about sort of how to put both the opportunities that have
         been presented and the challenges that have arisen into a sort of bucket, and then figure
14       out how – what's the best way to navigate through those sorts of things. Generally
         speaking, it could be very difficult to understand what the impact of this is going to
15       be on something like a final cost or a revenue number or even a schedule, frankly, until
         you turn that through tens of thousands of hours of engineering time to convert that
16       into a new scenario, right?

17       And in our case, we were actually running multiple scenarios. You put them in, you
18       put them into the black box, and you get them out after a period of time. And so our
         view was, generally speaking, we need to process all of this information. And it wasn't
19       really until all that recently that it made sense to take a different scenario approach to
         this. I think it's also worth mentioning that it's not just rates, right? So rates are one
20       part of it, and they are a meaningful part. But there are other things as well that have
         an impact. Again, I mentioned sort of labor rates, materials costs, even energy volatility
21       and volatility around some of these things can have a pretty significant impact on the
22       way that you have to structure the risk management around plants like this.

23
24       198.    In connection with the earnings call, Origin published a PowerPoint presentation on its

25   website (the "2Q23 Earnings Presentation"). This presentation disclosed that the Company's strategy

26   of focusing on high-margin products, such as FDCA, began in February 2023, stating: "[a]s of

27   February 2023, Origin Materials' commercial strategy evolved from demand generation to revenue

28

generation and the development of higher margin products, and as such the Company does not plan to provide quarterly updates to its total signed offtake agreements and capacity agreements but will provide updates as appropriate."

199.    The 2Q23 Earnings Presentation further clarified that FDCA—the new focus for Origin 2 and a replacement for PX—would not be produced at the plant until 2028.

200.    The market reacted swiftly and severely to the news about Origin 2, with the Company's share price dropping by $2.88 per share – an approximate 66.5% decline – to close at $1.45 per share on August 10, 2023.

201.    Analysts were stunned by the significant delays and alterations to Origin 2.

202.    In a report on August 10, 2023, Sriharsha Pappu, an analyst at HSBC Global Research, asserted that the revised plans for Origin 2 fundamentally altered the investment case for the Company:

> The Origin investment case was all about proof of concept with plant 1 (see 2023 all about proof of concept, 6 Jan 2023), on technology and yields, followed by commercially significant output from plant 2 that would allow for value to be ascribed to the order book and to fund the plants to follow – Origin 3 and beyond. ***Now, with Origin 2 delayed and significantly more expensive than indicated earlier, that investment case is broken with the NPV of each plant lower and significant questions around funding capabilities and timelines to cash flow generation. The USD10+ bn in product demand is irrelevant without access to production capacity before 2026.***
>
> Our individual, sequential plant DCF valuation for Origin is heavily impacted by the delays to Origin 2 and cost overruns which will cascade across all of the future plants that the company has planned. We downgrade to Hold from Buy on a broken investment case and cut TP to USD2 from USD15.

203.    On August 11, 2023, Craig-Hallum analysts Eric Stine and Aaron Spychalla underscored the seriousness of Origin 2's delays and its product shift to FDCA:

> In our opinion, this all takes a back seat to the major curveball served up in the form of the decision to shift planned Origin 2 production to focus on FDCA (a renewable substitute used in the production of polyester) from paraxylene (pX) to capture expected higher margins… In addition, it will now be at a minimum 2-3 years longer to find out whether this shift is successful. As a result, we are lowering our rating on ORGN to a Hold.

\* \* \*

This decision also changes the planned timeline for Origin 2 with ORGN planning a phased approach with Phase 1 start-up now planned for late 2026 to 2027 and Phase 2 start-up expected in 2028. This decision is in response to "much greater demand than anticipated" for FDCA and we sense that this new timeline is the result of having to "re-start the clock" in terms of engineering and scope for the new plant focus.

204.    In the wake of Origin 2's significant delay and the Company's revised business model, Origin's stock took a steep dive in the subsequent weeks, as its primary future revenue driver – Origin 2 – remained far from completion.

205.    By October 31, 2023, Origin's stock had fallen further, closing at $0.99—a decline of an additional 68% since August 10, 2023.

206.    On November 20, 2023, the Company announced a 30% reduction in its workforce as part of an "organizational realignment" designed to streamline operations and focus on near-term, high-margin priority initiatives.

207.    On January 5, 2024, Origin filed a Form 8-K with the SEC disclosing that it had received a letter dated January 4, 2024 from NASDAQ, notifying the Company that it had failed to meet listing requirements because its stock had closed below $1.00 per share for 30 consecutive business days.

## THE SECURITIES CLASS ACTION

208.    On August 25, 2023, a Securities Class Action was filed against the Company and certain Individual Defendants, including Defendants Bissell and Riley, in the United States District Court for the Eastern District of California, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

209.    On March 1, 2024, Plaintiffs in the Securities Class Action filed a First Amended Complaint. On November 18, 2024, they filed a Second Amended Complaint.

210.    On February 12, 2025, the court in the Securities Class Action denied in part the defendants' motion to dismiss. The court concluded, among other findings, that the Amended Complaint sufficiently alleges that the defendants made statements that "were materially false or misleading."

211.    Specifically, the court found, among other things, that the plaintiff(s) in the Securities Class Action alleged sufficiently that the individual defendants in that action made false or misleading statements regarding the Company's concrete plans for Origin 2.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS WRONGFUL CONDUCT

212.    The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

213.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

214.    The Individual Defendants breached their fiduciary duties to Origin because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Forms 10-Q, press releases, and soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (i) a realistic timeline for the construction and launching of operations for its Origin 2 plant; (ii) the demand, and the Company's ability to meet the same, for PX and the resulting effects on Company value and profits; (iii) the cost of construction for Origin 2; (iv) the feasibility and scale of Origin 2; and (v) the resulting artificially inflated market and securities values of the Company.

## DAMAGES TO ORIGIN

215.    As a direct and proximate result of the Individual Defendants' misconduct, Origin has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

216.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and Chief Scientific and Medical Officer any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

217.    These expenditures also include, but are not limited to, the costs associated with

implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

218.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

219.    As a direct and proximate result of the Individual Defendants' actions, Origin has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

220.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

221.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

222.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

223.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

224.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

225.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

226.    The Company's Board is currently comprised of eight members, seven of which were board member during the relevant period: Defendants Bissell, Cook, Fish, Harvey, Rogerson, Stephanou, and Tripeny (the "Director Defendants") and non-party John Hickox. Thus, Plaintiff is only required to show that at least half of the Defendants, i.e., 4, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

227.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

228.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant Bissell**

229.    Defendant Bissell is not disinterested or independent, and therefore, is incapable of considering demand because he one of the Company's co-founders and current CEO, and has sat on the Company's Board since inception. Bissell, thus, derives substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

230.    The lack of independence and financial benefits received by Bissell renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

231.    In addition, Bissell is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

232.    Furthermore, the Company's 2024 Annual Proxy Statement, filed with the SEC on March 22, 2024 (the "2024 Proxy") concedes that Bissell is not an independent director.

233.    As such, Defendant Bissell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability

and threaten his livelihood.

**Defendants Tripeny, Cook, Harvey, Rogerson, and Stephanou**

234.    Defendants Tripeny, Cook, Harvey, Rogerson, and Stephanou are not disinterested or independent and, therefore, are incapable of considering demand because they not only sit on the Company's board of directors, but they also served a relevant times as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Despite their knowledge or reckless regard these Defendants caused the improper statements and representations alleged herein. For these reasons, Tripeny, Cook, Harvey, Rogerson, and Stephanou breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore excused.

235.    The Defendants, as members of the Board and officers of the Company, were and are subject to the Code of Business Conduct and Ethics, which go well beyond the basic duties required by applicable laws, rules, and regulations.  Specifically, the Codes require Directors and employees to act within the highest standards of business conduct, to promote high standards of integrity, to conduct affairs honestly and ethically, to know any comply with legal obligations, to participate in fair dealing, ensure accurate and timely disclosures, and promptly report any violations. The Individual Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Individual Defendants breached the Company's Code of Conduct and Code of Ethics, face substantial liability, and are not independent or disinterested, making demand upon them futile.

236.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and

managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

237.    Origin has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Origin any part of the damages Origin suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

238.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

239.    The acts complained of herein constitute violations of fiduciary duties owed by Origin's officers and directors, and these acts are incapable of ratification.

240.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Origin. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Origin, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is

brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

241.    If there is no directors' and officers' liability insurance, then the Directors will not cause Origin to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

242.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Origin's business and affairs.

245.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Origin's shareholders.

246.    In breach of their fiduciary duties owed to Origin, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

247.    The Individual Defendants had actual or constructive knowledge that the Company

issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Origin's securities.

248.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Origin's securities.

249.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

250.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Origin has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

251.    Plaintiff, on behalf of Origin, has no adequate remedy at law.

### <u>COUNT II</u>

**Violations of Section 14(a) of the Exchange Act
Against the Director Defendants**

252.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

253.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

254.     Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

255.     Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxy filed with the SEC on June 8, 2023 (the "2023 Proxy").  Specifically, the 2023 Proxy contained false statements and failed to disclose that (1) that Origin was experiencing problems developing its much touted product, PX; (2) the effects of such complications on the design, engineering, and construction of its also much touted flagship commercial scale production plant, Origin 2; (3) the timeline, actual purpose, and realistic costs of getting Origin 2 up and running; (4) the resulting overall value (and/or cost) of the project to the Company.

256.     The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxy were materially false and misleading.

257.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

258.     Plaintiff has no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### Against the Individual Defendants

259.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

260.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Origin.

261.    Each of the Defendants received payment from Origin, in the form of either salary or director fees while actively breaching their fiduciary duties to Origin.

262.    All the payments and benefits provided to defendants were at the expense of Origin. The Company received no benefit from these payments.

263.    Plaintiff, as a shareholder and a representative of Origin, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

264.    Plaintiff, on behalf of Origin, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### Against the Individual Defendants

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Origin to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

267.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

268.    Plaintiff, on behalf of Origin, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of Origin and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Origin;

c) Determining and awarding to Origin the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Origin's corporate governance and internal procedures to comply with applicable laws and to protect Origin and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 10, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Alex J. Tramontano*
    ALEX J. TRAMONTANO

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Telephone: (619) 239-4599
Facsimile: (619) 234-4599
2  manifold@whafh.com
byrd@whafh.com
3  tramontano@whafh.com

4  JUSTIN A. KUEHN
MOLLY BROWN
5  **KUEHN LAW, PLLC**
53 Hill Street, Suite 605
6  Southampton, NY 11968
Telephone: (833) 672-0814
7  justin@kuehn.law
molly@kuehn.law
8

9  *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Travis Tanasse, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Origin Materials, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___5___ day of ___March___ 2025.

Travis Tanasse (Mar 5, 2025 17:03 PST)

TRAVIS TANASSE